**LAKEWOOD (City), A Municipal Corporation, Plaintiff, v. THORMYER, Individually and as Dir. of Highways, Defendant.**

Common Pleas Court, Cuyahoga County.

No. 703617. Decided November 28, 1958.

66

Arter, Hadden, Wykoff & Van Duzer, Ashley M. Van Duzer, Clay Mock, William R. Hapner, Jr., Cleveland, George E. Fedor, Director of Law, Lakewood, for City of Lakewood.

William Saxbe, Atty. Genl., Hugh E. Kirkwood, Jr., I. Charles Rhoads, Asst. Attys. Genl., John T. Corrigan, Pros. Atty., A. M. Braun, Asst. Pros. Atty., for Director of Highways.

## OPINION

By HOOVER, J.

On the west side of Greater Cleveland the river of Rocky River cuts a deep gash into the earth as it flows northerly into Lake Erie. On its west bank is the city of Rocky River; on its east bank, the city of Lakewood. The river's center line is the boundary between these two cities.

Not far south of the lake, a highway, known both as State Route No. 2 and as State Route, U. S. No. 6, roughly parallels the lake shore, running in an easterly-westerly direction and crossing the river's chasm by a bridge.

In order to get across the river, the highway does sort of a multi-jointed contortion. Through much of Lakewood it proceeds westerly over either Lake Avenue or Clifton Boulevard in a fairly straight line until, as it approaches the river, it comes to a point at the west end of Clifton Boulevard. There it makes a left-angle turn onto West Clifton Boulevard, then a right turn onto Sloane Avenue which in turn makes an abrupt turn to the left and then a right angle turn onto the bridge. Once across the bridge, it makes a sharp turn to the right, passes under a railroad bridge, then makes an abrupt left turn on West Lake Road. In addition there are some lesser curves.

Going over this same bridge, is a third highway known as State Route U. S. No. 20. It courses westerly through Lakewood over the same streets as the other two routes including the tortuous turns leading to the bridge, but, on leaving the west end of the bridge, makes a left-angle turn and goes south on Wooster Road.

For simplicity, we use the name "Director" to designate either the Director or Acting Director of Highways of Ohio. The Director has proposed to eliminate this highway contortion by relocating part of the highway (which we sometimes call the "Director's Proposal") so as to make it run in practically a straight line from the end of Clifton Boulevard in Lakewood to West Lake Road in Rocky River and crossing the

river with a new bridge. This proposal, a limited access highway, cuts right through properties in a fine, Lakewood residential district—Clifton Park. Lakewood objects—hence this suit.

The Director claims the right to effectuate his proposal without Lakewood's consent by virtue of power vested in him by §5521.01 R. C., which reads in part:

"The director may establish, construct, reconstruct, improve, widen, maintain, or repair any section of state highway within the limits of a city, including the elimination of railway grade crossings, and pay the entire or any part of the cost and expense thereof from state funds, but in all cases he shall first obtain the consent of the legislative authority of such municipal corporation.

"**Provided**, that when a federal aid primary highway or a federal aid interstate highway is located within a municipal corporation and, in the opinion of the director, is in **urgent need of repair, reconstruction, widening, improvement, or relocation, so as to accommodate the traveling public**, the director of highways shall submit a written request to the legislative authority of the municipality for its consent to the desired improvement. The legislative authority shall within sixty days after such written request has been received from the director either grant its consent to the improvement or refuse such consent by filing in writing with the director a statement of its reasons for refusing the consent and such alternate proposals as it deems reasonable. If the legislative authority fails to act or refuses consent, the director may upon consideration of the reasons for rejection make a **resolution declaring the necessity of said improvement** which shall be spread upon his journal and then proceed in the same manner as if consent had been given. A certified copy of said resolution shall be served upon the municipal legislative authority which may, within twenty days from the date of said service, appeal to the court of common pleas of the county in which such municipal corporation is situated, upon the **reasonableness and necessity of the action provided for in the resolution.** In the hearing upon appeal the director may introduce the record of his proceedings and such other competent evidence as he desires in support of his resolution, and the municipality may likewise introduce competent evidence opposing such resolution. The court may **affirm or revoke** said resolution. The decision of the common pleas court may be appealed to the court of appeals and the supreme court as in other cases. If the court affirms said resolution the director may proceed with said improvement with or without the co-operation of said municipality."

For brevity, we shall refer to this statute as "the proviso." This is a question of first impression. The proviso has never been the subject of litigation. In fact, this is the first time the Director has taken action under it.

A physical mountain of contention has been heaped before the court—approximately 1000 pages of testimony, 225 pages of briefs, 75 different exhibits and 700 pages in the exhibits. Consequently we shall not discuss all the questions raised, but only some of the important ones. Many of the questions readily topple in the battle of briefs and need little or no treatment here.

At the outset we have three procedural questions to decide. First, is the hearing in this court a trial de novo? The proviso does not specifically say one way or another. However, a study of its statutory history convinces us that this trial is now de novo for two reasons. Before its last amendment, the proviso did not provide for the introduction of new evidence in this trial, while now it does. Before that amendment, the proviso specifically provided that this should not be a trial de novo, in these words "Such appeal shall not be heard as a trial de novo." (122 O. L. 416; it was once §1178-42 GC). That provision was deleted by the amendment. As is said in 37 O. Jur. (Statutes) 769, Sec. 439.

"* * *the presumption arises that the legislature intended some change in the effect and operation of the law by a substantial change in the language of the statute."

See 40 C. J. S. (Highways) 80, sec. 196.

The second procedural question is—which party has to proceed first and which party has the burden of proof? The statute does not specifically say which. The Director volunteered to proceed first and in his brief he acknowledged that he has the burden of proof. The court declares this the proper procedure. It is significant that the statute first mentions that the Director may introduce evidence, and then mentions that the municipality may do it. Because of the extraordinary nature of this procedure, this interpretation seems fairer.

The third procedural question is—is this controversy governed by The Ohio Administrative Procedure Act? We do not believe that it is. Sec. 119.01 (A) R. C.

Approaching the substantive questions, the first one is—has the Director brought himself within the provisions of the proviso so as to be entitled to proceed thereunder? We believe he has. An analysis of the proviso shows that there are seven essential steps to the bringing of this action, namely:

1. A federal aid primary highway or a federal aid interstate highway located within Lakewood must be involved.

2. The Director must determine that such a highway is in urgent need of repair, reconstruction, widening, improvement, or relocation, so as to accommodate the traveling public.

3. The Director must submit a written request to the legislative authority of Lakewood for its consent to such improvement.

4. Within sixty days after receiving such written request, Lakewood's legislative authority must either grant its consent to the improvement or refuse such consent by filing in writing with the Director a statement of its reasons for refusing the consent and such alternate proposals as it deems reasonable.

5. If Lakewood's legislative authority fails to act or refuses to consent, the Director must upon consideration of the reasons for rejection make a resolution declaring the necessity of said improvement and spread it upon his journal and proceed in the same manner as if consent had been given.

6. A certified copy of said resolution must be served on Lakewood's legislative authority.

7. Within twenty days from the date of said service, Lakewood must appeal to this court upon the reasonableness and necessity of the action provided for in the resolution.

We believe there is no question but that there has been compliance with steps No. 2 through No. 7. It would serve no useful purpose to spread the details of it here; suffice it to say that the appeal is here via Lakewood's refusal to consent and its making alternate proposals.

However, Lakewood seriously contends that step No. 1 has not been met because, it says, no federal aid primary highway or federal aid interstate highway is involved. In support of this, it points out that no request has been made of federal authorities for federal aid, and that no federal aid has been granted, to construct the Director's Proposal. This is not enough to establish Lakewood's contention. The testimony clearly shows that both State Routes U. S. No. 6 and No. 20 in the area as they existed in their old location are on the federal aid primary highway system. In other words, the whole tortuous route proposed to be eliminated is on the system, the Director's Proposal connects two points on the system and the system extends westerly beyond the most westerly of those two points and easterly beyond the most easterly of the points. That is sufficient compliance. Note that the proviso reads:

"Provided, that when a federal aid primary highway or a federal aid interstate highway is located within a municipal corporation and, in the opinion of the director, is in urgent need of repair, reconstruction, widening, improvement, or relocation" etc.

Note that this proviso contemplates change in the highway by "relocation." It doesn't say that the proposed relocation must be on the federal aid system. The requirement is satisfied if, what's on the system, is an existing highway that's proposed to be relocated.

Lakewood claims that the Director's Proposal does not come within step No. 1, because it really contemplates building a new highway and not relocating an existing one. "To relocate" means to locate again. Webster's New International Dictionary (2nd ed., unabridged) 2105. Naturally, it contemplates a change of course. There doubtless comes a time when a proposed deviation is so great that it must be considered the construction of a new highway instead of the relocation of an existent way. It is a question of fact in each case. We have no hesitancy here in finding as a fact that the Director's Proposal is a relocation and not a new highway. To hold otherwise would be like saying that a couple of hairs on a Saint Bernard's tail was wagging him. If one were to look down on the situs from a helicopter and see what had been State Routes U. S. No. 6 and No. 20 extending in the distance with the Director's Proposal completed, we doubt that he would conclude that the highways had vanished. In Bossard v. Hotchkiss, 190 Wis. 29, it is said:

"When we consider the fact that the present ordinary state highway is from fifty to several hundred miles long, a relocation of five or ten miles or more is not in fact the laying out of a new highway but only a change in an existing one * * *." (p. 31.)

*          *          *          *          *

"A state highway may be relocated under sec. 8308, Stats., without the abandonment of the old highway." (syl. 4.)

See Jenkins v. State Highway Commission, 205 Ia. 523, syl. 2, 532-33 (approving 3 mile cut off which eliminated 4 miles of 350 mile road); and Wilkinson County v. State Highway Commission, 191 Miss. 750, syl. 1 (approving new line departing 8 to 12 miles from old one).

Lakewood contends that the procedure provided in the proviso is unconstitutional because it does not provide Lakewood with an opportunity for a hearing before the Director. This contention we cannot accept. We believe the answer is simple when approached through the analogy of certain fundamental principles of eminent domain and highway law, which we now discuss. The Director starts action under the proviso by deciding that a certain type of highway "is in **urgent need** of repair, reconstruction, widening, improvement, or relocation, so as to accommodate the traveling public." In other words, it is a decision as to **necessity**. In the field of eminent domain a public necessity must exist before government can take property away from a private owner without his consent. The law as to this latter type of necessity has been thoroughly litigated and furnishes many analogies which are helpful in deciding the "need" question under the proviso.

Some of these fundamental principles are as follows: When the intended use is public, the determination of the necessity for, and the proper extent of, the taking of private property under the power of eminent domain are primarily legislative or political questions (we shall refer to them as "political question"); they are not judicial questions to be determined by courts. Other determinations which are political and not judicial ones, are: the utility of the proposed improvement, its expediency, and the selection of a particular location, line or route. These being political questions, the legislature may determine them itself, or it may, and usually does, delegate this power of determination to some subordinate agency (which we shall some times refer to as the "grantee of the power"). Since these are political questions and not judicial questions, it is not necessary that the legislature provide a hearing for the property owner on these questions before the legislature or the grantee of the power makes a determination of them. The legislature may provide such a hearing but it need not. Moreover, the legislature may provide for an appeal to a court as to such determinations, but it need not. If the legislature provides no such hearing, courts will not intervene unless there is bad faith, fraud or abuse of discretion. In **19 O. Jur. 2nd (Eminent Domain), 427, 428, sec. 19,** it is said:

"The necessity for, and the proper extent of, the taking under the power of eminent domain are primarily legislative questions, and, in the absence of fraud, bad faith, or abuse of discretion, such determination will not be disturbed by the courts.

"The legislature may determine the propriety of exercising the power of eminent domain, or it may delegate the power of determination to subordinate agencies, including private corporations."

How widely this power has been delegated by the Ohio Legislature is seen in **19 O. Jur. 2nd (Eminent Domain) 421, secs. 12, 13.** In **1 O. Jur. 2nd (Administrative Law And Procedure) 502-03, sec. 107,** it is said:

"There is no right to notice of the exercise of political rather than judicial powers, as where county commissioners are authorized, upon petition, to determine the necessity of appropriating lands for a ditch which is necessary and conducive to public welfare."

In an annotation in 65 A. L. R. 504, it is said:

"On the general question of the respective functions of the courts and of the legislature (or the grantee of legislative power), with respect to the necessity for taking property under eminent domain, it may be said that in general the question of the utility of the proposed improvement, the extent of the public necessity for its construction, the expediency of constructing it, the suitableness of the location selected, and the consequent necessity for taking the land selected for its site, are all questions exclusively for the legislature, with which the courts have no power to interfere; yet the courts have power to interfere to prevent an abuse of discretion delegated to the legislature * * *."

See Note on "Judicial power over the right of eminent domain," 22 L. R. A. n. s. 1, at 64-71. In 40 C. J. S. (Highways) 79, sec. 196, it says:

"The necessity and propriety of the improvements, their kind, character, and extent, and the matter of their execution or construction are confided to such boards, officers, or agencies as the legislature has provided for that purpose, and, in the absence of any provision for the review of their action on appeal or otherwise, their findings and decision are final, and not subject to review, as long, at least, as they act in good faith and within the scope of the authority conferred on them." .

In 18 Am. Jur. (Eminent Domain) 731-32, sec. 105, it is said:

"The legislature, in providing for the exercise of the power of eminent domain, may directly determine the necessity for appropriating private property for a particular improvement or public use, and it may select the exact location of the improvement. In such a case, it is well settled that the utility of the proposed improvement, the extent of the public necessity for its construction, the expediency of constructing it, the suitableness of the location selected, and the consequent necessity of taking the land selected for its site are all questions exclusively for the legislature to determine, and the courts have no power to interfere or to substitute their own views for those of the representatives of the people. Whether there is such an exigency—whether it is wise and expedient or necessary that the right of eminent domain be exercised—rests solely within the determination of the legislature. The state is not obliged to debate its needs with any property owner. The state determines for itself whether, in a given case, an exercise of the power of eminent domain is needful. The question is political, and the state is not obliged to provide any tribunal in which interested persons may be heard on the question."

In 39 C. J. S. (Highways) 1033, sec. 97, it is said:

"In the exercise of the police power, the state may change or alter public highways. The power of the state in this respect is vested in the legislature, which may exercise it either directly or by authorizing, the making of the change or alteration by some appropriate agency * * *."

In 40 C. J. S. (Highways) 25, sec. 177, it is said:

"The construction, maintenance, and repair of public highways is a governmental function, which belongs primarily to, and may be exercised by, the state and the state legislature. The power * * * is * * * part of its police powers * * * Subject to constitutional restrictions, the work of constructing or maintaining highways may be done by the state, in its own name, or * * * may be conferred * * * on * * *." (Then is stated a long list including a designated officer such as a state highway director.)

In 40 C. J. S. (Highways) 39, sec. 179, it is said:

"A state legislature has the authority to lay out the routes of the highways of the state * * *. The legislature may exercise this power through its own agencies or delegate it to inferior bodies * * *. The location of state highways is, under the statutes, ordinarily vested exclusively in the state highway officers, and such authority cannot be exercised by the courts."

On the same page, fn. 19, it is said:

"The power to determine the location of such highways is a legislative, not a judicial function."

In 18 Am. Jur. (Eminent Domain) 735, sec. 108, it is said:

"A broad discretion is necessarily vested in those to whom the power of eminent domain is delegated, in determining what property is necessary for the public purpose, with respect to the particular route, line, or location of the proposed work or improvement; and the general rule is that the courts will not disturb their action in the absence of fraud, bad faith, or gross abuse of discretion."

In 18 Am. Jur. (Eminent Domain) 685, sec. 57, it is said:

"Ordinarily the question whether the public necessity and convenience require the laying out of a particular public way is wholly for the commissioners, charged with the duty of laying out ways, to decide; and, unless specifically given the power by statute, it is not for the courts to overrule their decision."

In 18 Am. Jur. (Eminent Domain) 733, sec. 106, it is said:

"Where the intended use is public, the necessity and expediency of the taking may be determined by such agency and in such mode as the state may designate. They are legislative questions no matter who may be charged with their decision, and a hearing thereon is not essential to due process in the sense of the Fourteenth Amendment. It follows that when the legislature has delegated the power of eminent domain to municipal or public service corporations, or other tribunals or bodies, and has given them discretion as to when the power is to be called into exercise and to what extent, the courts will not inquire into the necessity or propriety of the taking." (See also, 18 Am. Jur. 976, sec. 334.)

In 27 O. Jur. 2nd (Highways And Streets) 27-28, sec. 13, it is said:

"* * * the discretion vested in county commissioners and the State Director of Highways with respect to the determination of the location or route of a proposed highway will not be interfered with by the courts of injunction, in the absence of fraud or an abuse of such discretion." (Citing **State, ex rel. Huffman v. Shuff,** 20 Oh Ap 432, and an annotation on "Power and duty of highway officers as regards location or routes of roads to be constructed or improved" in 91 A. L. R. 242.)

See also, Nichols, Eminent Domain (3rd ed., 1950), Vol. 1, pp. 186-191, 209-210, secs. 3.1 (1), 3.1 (2), 3.21 (1). In a case arising in Ohio, Sears v. City of Akron, 246 U. S. 242, it was held:

"A state statute held not to violate Art. I, Sec. 10 of the Constitution, or the Fourteenth Amendment, in authorizing a city to determine without hearing the necessity and extent of the appropriation of private property for its public purposes." (syl. 4.)

\* \* \* \* \*

"Plaintiff contends that the ordinance is void because the general statute which authorized the appropriation violates both Article I, Sec. 10, of the Federal Constitution and the Fourteenth Amendment, in that it authorizes the municipality to determine the necessity for the taking of private property without the owners having an opportunity to be heard as to such necessity \* \* \*. It is well settled that while the question of whether the purpose of a taking is a public one is judicial \* \* \* the necessity and the proper extent of a taking is a legislative question." (p. 251.)

In **Zimmerman v. Canfield, 42 Oh St 463, 471,** it is said:

"So far the proceedings are preliminary. The State has delegated to the commissioners so much of her power of eminent domain as is necessary to determine whether the construction of the ditch is so far a public necessity, as that it is demanded by considerations of public health, convenience or welfare. There is nothing in the constitution of our state which guarantees to the owner of lands traversed by a ditch a trial by jury, or other judicial investigation, to determine upon its necessity or whether it will conduce to the public good."

"While the statutes in question do provide for such a hearing upon appeal, it is so rather as a matter of favor than of right."

"The commissioners, in determining this preliminary question of the necessity of appropriating lands for the purposes of a ditch, are called to the exercise of political and not judicial powers. It is a question rather of public policy than of private right. \* \* \* (Citations.)

"It is not upon the question of the appropriation of lands for public use, but upon that of compensation for lands so appropriated, that the owner is entitled, of right, to a hearing in court and the verdict of a jury."

Other authorities to effect that the land owner has no constitutional right to a hearing on the question of necessity are: North Laramie Land Co. v. Hoffman, 268 U. S. 276, syl. 3, 284 (here particular objection was made because there was no opportunity to be heard on the question of location); State of Georgia v. City of Chattanooga, 264 U. S. 472, syl. 3, 483; Joslin Mfg. Co. v. City of Providence, 262 U. S. 668, syl. 10, 678; Bragg v. Weaver, 251 U. S. 57, syl. 1, 58; **19 O. Jur. 2nd (Eminent Domain), 429, sec. 19;** 2 Lewis, Eminent Domain (1909 ed.) 1008-09, sec. 567; 16-A C. J. S. (Constitutional Laws) 931, sec. 646.

By analogy, we believe that powers given to the Director by the provisio to make a determination of "urgent need" and to "make a resolution declaring the necessity of said improvement" involve political determinations, and therefore, that Lakewood has no constitutional right

to a hearing before the Director as a condition precedent to his exercising such powers.

Moreover, since the proviso gives Lakewood a right to a trial de novo in this court, with the right to appeal to the court of appeals and the supreme court, it cannot say that any constitutional right which it may have to a hearing is denied. See **Squire v. Abbott, 5 O. O.** (this court) 35**2**, 362; **The Cleveland, Cincinnati, Chicago & St. Louis Ry. Co. v. Mills Bros., 101 Oh St 173, Syl. 4, 179;** 18 Am. Jur. (Eminent Domain), 974, sec. 331; Bragg v. Weaver, 251 U. S. 57, syl. 2, 59; Phillips v. Commissioner, 283 U. S. 589, syl. 3; Anno., 84 A. L. R. 1098, 1099; 16-A C. J. S. (Constitutional Law) 934, sec. 646.

Lakewood further contends that the proviso is unconstitutional because it delegates powers to the Director without establishing sufficient criteria or standards to guide his determination. Thus, he is given power to determine when a certain type of highway **"is in urgent need of repair, reconstruction, widening, improvement or relocation, so as to accommodate the traveling public"** and to **"make a resolution declaring the necessity of said improvement."** We believe that these are elemental concepts speaking for themselves, and, in themselves are guideposts enough.

For authoritative precedent we need look no further than eminent domain statutes. Throughout the land for decades, these have given public officials the right to declare the necessity of taking private property for public improvements without those statutes enumerating long lists of facts that needed to be present to constitute such necessity. That concept has long been recognized as criteria enough. There is no better example than our own state highway "Appropriation of property" statute, §5519.01 R. C., which simply says:

"If the director of highways is unable to purchase property for any purpose authorized by (enumerating code sections) he shall first enter on the journal of the department of highways a finding that it is **necessary,** for the public convenience and welfare, to appropriate such property **as he deems needed** for such purposes."

All through the highway laws, the director is given power to make determination of questions such as necessity, requirement, adequacy, expediency, convenience, practicality, safety etc. Some of these revised code sections are: §§5501.11 (Par. 2); 5501.111 (Par. 1); 5501.13; 5501.14; 5501.161 (Par. 1); 5511.03 (Par. 1); 5511.04 (Par. 4); 5511.06 (Par. 3); 5511.07 (Par. 1); 5513.04 (Pars. 1 and 2); 5515.01 (Par. B); 5515.02 (Par. 3); 5515.05 (Par. 1); 5515.06; 5517.03 (Pars. 1, 2 and 3); 5519.01 (Par. 1); 5521.01 (Par. 2); 5523.01; 5523.02; 5523.03 (Pars. 1, 3 and 4); 5523.10; 5523.16; 5523.19 (Par. 1); 5523.20; 5524.02 (Par. 2); 5524.03 (Par. 1); 5529.02; 5529.03; 5529.04; 5531.01 (Par. 1); 5535.03 (Par. 1); 5535.07 (Par. 1); 5561.16 (Par. 2). Likewise such types of determination are authorized under the Turnpike Commission law without detailed guideposts. See §§5537.01 (Par. B); 5537.03 (locations); 5537.04 (Pars. I, J, L); 5537.05 (Par. 2); and 5537.17 (Par. 3) R. C.

In describing the duties and powers of the Director, §5501.11 R. C., states:

"He may alter, **widen,** straighten, realign, **relocate,** establish, construct, **reconstruct, improve,** maintain, **repair** and preserve any road or highway on the state highway system * * *." (Emphasis ours.)

The words we emphasized are also found in the proviso. As part of his daily duty, the director determines whether a highway on the state highway system is in need of improvement. The legislature has given him no more and no less guide posts to make his determination under the proviso, than it did by the enactment of §5501.11 R. C.

To exact the narrow interpretation that Lakewood urges, might place in jeopardy the constitutionality of the entire highway act. In a world that lives on rubber tires, such interpretation is unwise and anachronistic. In Lichter v. United States, 334 U. S. 742, syl. 3 (C), 785, the Supreme Court held that the statutory term "excess profits" as used in the Renegotiation Act was a sufficient expression of legislative policy and standards to render it constitutional against the contention of insufficient criteria, and that Congress need not supply administrative officials with a specific formula for their guidance in a field where flexibility and the adaptation of legislative policy to infinitely variable conditions constitute the essence of the program. At page 786, the U. S. Supreme Court pointed out:

"The following, somewhat comparable, legislative specifications are among those which have been held to state a sufficiently definite standard for administrative action:

" 'Just and reasonable' rates for sale of natural gas, Federal Power Commission v. Hope Gas Co., 320 U. S. 591, 600-601; 'public interest, convenience, or necessity' in establishing rules and regulations under the Federal Communications Act, National Broadcasting Co. v. United States, 319 U. S. 190, 225-226; prices yielding a 'fair return' or the 'fair value' of property, Sunshine Coal Co. v. Adkins, 310 U. S. 381, 397-398; 'unfair methods of competition' distinct from offenses defined under the common law, Federal Trade Commission v. Keppel & Bro., 291 U. S. 304, 311-312, 314; 'just and reasonable' rates for the services of commission men, Tagg Bros. & Moorhear v. United States, 280 U. S. 420, 431; and 'fair and reasonable' rent for premises, with final determination in the courts, Levy Leasing Co. v. Siegel, 258 U. S. 242, 243, 248-250."

Without doubt Ohio's Supreme Court espoused this forward-looking viewpoint when it upheld the constitutionality of the turnpike act in **State, ex rel. Allen v. Ferguson, 155 Oh St 26;** and, without doubt, it espoused it in **Matz v. Curtis Cartage Co., 132 Oh St 271.**

We find this same progressive viewpoint being followed in the interpretation of highway laws. **Neuweiler v. Kauer, 62 Abs 536, 540** (criteria held sufficient where Director required to make preliminary finding that his action "is necessary for the public convenience and welfare"); **Englewood v. Bettis, 15 Abs 8, syl. 4, 9-10** (sufficient criteria where Director authorized to erect automatic traffic signals at such intersections on the state highway system "as he may deem necessary"); Holloway v. Purcell, 35 Cal. 2nd, 220, syl. 11, 231-32 (sufficient where authorized to designate and construct freeways on "such terms and conditions as in its opinion will best subserve the public interest," citing

many cases); Dept. of Public Works v. Lanter, 413 Ill. 581, 585-590 (sufficient where empowered to designate and establish freeways "when the safety and convenience of highway traffic will be promoted and the public interest subserved thereby"); Ennis v. State Highway Commission, 231 Ind. 311, syl. 7, 325-327 (sufficient where Highway Commission authorized to construct toll road projects "at such locations as shall be approved by the governor, and in accordance with such alignment and design standards as shall be approved by the highway commission"); State, ex rel. Thomson v. Giessel, 265 Wis. 185, syl. 4, 190-194 (sufficient where authorized to determine feasibility of route between two points); Guthrie v. Curlin, 263 S. W. 2nd (Ky) 240, syl. 3, 244; Rogge v. United States, 128 Fed. 2nd 800, syl. 7, 803 (sufficient where Secretary of Interior authorized to fix and collect tolls when deemed necessary and advisable).

A further contention of Lakewood is that the proviso violates the home rule provision of the state constitution. With this we disagree. Home rule is restricted to matters of local self-government. Here involved are some state highways coursing across the state from boundary to boundary. Only a small segment of them pass through Lakewood. State highways are state matters and the legislature has power over them when it wishes to assume it. Under the proviso, the state has asserted this power. By withholding its consent under the guise of home rule, a municipality can no more stop the state legislature (or its proper grantee of the power) from improving or relocating a state highway within the municipality's boundaries than a municipality can stop it from building a state turnpike through the municipality. See **State, ex rel. Ohio Turnpike Commission v. Allen, 158 Oh St 168, 174; Lakewood v. Thormyer, 79 Abs 41, 49-50,** affirmed item. 50; **State, ex rel. Ellis v. Blakemore, 116 Oh St 650, 658; Englewood v. Bettis, 15 Abs 8.** In 40 C. J. S. (Highways) 38, Sec. 179, it is said:

"Where authority is conferred on the state highway officers to designate, locate, and alter roads of the state highway system, they may do so without consent of the local authorities."

Lakewood also assails the proviso on the alleged ground that there is an unconstitutional delegation of power to the federal Secretary of Commerce to determine what municipalities may be subjected to the Director's authority, since the only highways to which the proviso relates are federal aid primary highways and federal aid interstate highways and since no highway can be placed in either of those categories without the Secretary's approval. We cannot accept this contention. **Sec. 5501.02(B) R. C.,** expressly authorizes the department of highways:

"To co-operate with the federal government in the establishment, construction, reconstruction, improvement, maintenance, and repair of post roads and other roads designated by the federal authorities."

It is the Director who selects Ohio highways for placement on these two federal aid systems, and they are subject to the approval of the Secretary. If they are approved they are eligible for federal funds. The state loses no control or supervision over them. They are still a part of the state highway system. Even sovereigns may co-operate without derogating from their sovereignty. Steward Machine Co. v. Davis,

301 U. S. 548, 597. The proviso does not surrender sovereign power. Our legislature itself has laid down a policy and enacted a law. It merely has, and has a right, to say upon what contingencies or conditions the law shall operate. Here that contingency, a permissible one, is the placement of a highway on one of those two federal aid systems. **Warm v. City of Cincinnati, 57 Oh Ap 43, syl. 2, 49-50, 53; Opdyke v. Security Savings & Loan Co., 157 Oh St 121, 154-55; The Cincinnati, Wilmington and Zanesville Railroad Co. v. Commissioners of Clinton County, 1 Oh St 77, syl. 5, 86-89;** The Home Ins. Co. v. Sweigert, 104 Ill. 653, syl. 2, 664-67. Helpful analogies are found in the so-called corporate retaliatory statutes (14 a C. J. Corps. 1268-69, secs. 3971, 3972; **13 O. Jur. 2nd, Corps., 570-71, sec. 1074;** Anno., 91 A. L. R. 795, 798-801; 16 C. J. S., Const. Law. 565-66, secs. 135, 136) in statutes governing formalities of executing wills (9 **O. Jur. 2nd, Conflicts of Laws, 798-99, sec. 98;** Anno., 169 A. L. R. 554) and in statutes governing the validity of conveyances (9 **O. Jur. 2nd, Conflict of Laws, 766, sec. 82; 17 O. Jur. 2nd, Deeds, 111, sec. 5;** 11 Am. Jur., Conflict of Laws, 333, sec. 34).

Neither are we convinced by Lakewood's attack on the constitutionality of the proviso on the grounds (1) that it is a general law not of uniform operation throughout the state because it treats federal aid primary and federal aid interstate highways as an unreasonable classification and (2) that there is an invalid delegation of power to the officials who determine what highways are to be placed on these federal aid systems because no criteria is provided them to guide such determination. According to the applicable federal statute, the Secretary in approving projects for federal aid "shall give preference to such projects as will expedite the completion of an adequate and connected system of highways, interstate in character." U. S. C. A., Title 23, sec. 6. Obviously such highways are of prime importance both to the state and nation. According to the criteria law discussed above, the criteria here is sufficient. Moreover, we believe the classification reasonable. Reasonableness of classification is all that is required. The presence of some inequality does not mean that a Classification is unreasonable. Mathematical exactness and the impractical are not required. The procedure set forth in the proviso applies to any Ohio municipality when a federal aid primary or federal aid interstate highway within its limits is in urgent need of improvement. It operates equally upon every municipality within the circumstances covered by the act. **The Steele, Hopkins & Meredith Co. v. Miller, 92 Oh St 115, syl. 2;** State, ex rel. **Lemperle v. McIntosh, 75 Oh Ap 164, 170-71;** 12 Am. Jur., Constitutional Law, 157-159, sec. 483.

Lakewood strongly urges that the decision which the Director made under the proviso is invalid because at the time it was made he could not act with an impartial mind due to the fact that previously by contract he had bargained away his power to decide, thus making it impossible for him to obey the proviso, that is, to consider Lakewood's written statement and reach an impartial conclusion. It is a fact that on **October 27, 1955,** which was sometime prior to his taking action under the proviso, the Director had entered into a written agreement

with the Cuyahoga County Board of Commissioners entitled "Agreement of Co-operation between the State of Ohio through its Director of Highways and the County of Cuyahoga through its Board of County Commissioners covering the construction of a new traffic facility consisting of a bridge over Rocky River and the necessary approaches thereto." Among other things, this agreement provides that public convenience, welfare and necessity require the construction of the Director's Proposal, that it has been delayed by Lakewood's refusal to consent, and that the Director intends to use the powers granted to him by the proviso, and thereupon to proceed with the construction.

Without deciding whether this contract placed the Director in such a biased position that this court should set aside his action under the proviso (see Brinkley v. Hassig, 83 F. 2nd 351, 356-57, discussing administrative agency investigating and filing charges, then trying such charges; and 42 Am. Jur., Public Administrative Law, 312-13, sec. 22, discussing rule of necessity) we believe that if there is any infirmity in the Director's acts in this regard, it is cured by the fact that Lakewood now is given the opportunity to try this case de novo in an impartial tribunal—the Common Pleas Court. 18 Am. Jur. (Eminent Domain) 983-84, sec. 340; 42 Am. Jur. (Public Administrative Law) 311, sec. 20; Marquette Cement Mfg. Co. v. Federal Trade Commission, 147 F. 2nd 589, syl. 9. 594; Towns v. Klamath County, 33 Or. 225, 233-234.

Finally, we come to the heart of the substantive question involved in this appeal—"the reasonableness and necessity of the action provided for in the resolution" of the Director. Under date of July 29, 1957, the Director sent a letter to Lakewood's Council, saying:

"After thorough investigation and consideration, it is my opinion that there is urgent need for the relocation and improvement of U. S. Routes 6 and 20 and St. Rt. 2 in the City of Lakewood, by means of the construction of a new bridge with the necessary approaches thereto, north of the Nickel Plate Railroad, directly connecting Clifton Boulevard, in the City of Lakewood, with West Lake Road in the City of Rocky River. It is my further opinion that the relocation and construction of the improvement just stated will greatly facilitate the accommodations to the traveling public. This letter is officially to request the Council of the City of Lakewood for its consent and co-operation in the relocation and construction of the aforesaid improvement within the boundaries of the City of Lakewood."

By letter, dated September 25, 1957, Lakewood's council refused its consent to the Director's Proposal, stated its reasons therefor and made alternate proposals. On November 1, 1957, the Director entered a resolution on his journal, in which, among other things, he stated:

"WHEREAS * * the legislative authority of * * Lakewood * * refused the consent to said proposed relocation and improvement * * as requested and stated its reasons therefor together with suggested alternates * * and

"WHEREAS, I have * * thoroughly considered the reasons set forth and the proposed alternates * * and

"WHEREAS, in my opinion said highway within said city is in urgent need of relocation and improvement as requested.

"NOW, THEREFORE, be it resolved that said relocation and improvement of said highway Routes U. S. 6 and 20 and State Route No. 2, within the City of Lakewood is necessary and in the public interest * *."

After considering all of the evidence and the law, the court has no hesitancy in affirming the Director's resolution. The preponderance of the evidence unquestionably proves "the reasonableness and necessity of the action provided for in the resolution" and that the highways involved were and are in urgent need of relocation and improvement, as recommended in the Director's Proposal, so as to accommodate the traveling public. In Webster's New International Dictionary (2nd ed., unabridged), **"urgent"** is defined as:

"Urging; pressing; plying with importunity; calling for immediate attention; instantly important."

There, **"need"** is defined as:

"A condition requiring supply or relief; urgent exigency."

There, **"accommodate"** is defined as:

"To furnish with something desired, needed or convenient."

There, **"traveling"** is defined as:

"1. That travels; that is or accompanies a traveler; * * suited for one that travels; as * * a traveling salesman.

"2. That moves as along a fixed course or from place to place; not stationary or confined to a station; circulating; moved or sent from point to point; as * * a traveling circus * *."

There, **"public"** is defined as:

"The general body of mankind, or of a nation, state, or community; the people indefinitely."

There, **"reasonableness"** is defined as:

"Quality or fact of being reasonable."

There, **"reasonable"** is defined as:

"In accordance with reason; of men, acting, speaking, or thinking, under the guidance of reason; just; fair-minded; of their acts, thoughts, etc., agreeable to reason; not beyond the bounds of reason, logic, probability, etc.; as, a reasonable * * decision."

There, **"necessity"** is defined as:

"A state or condition imperatively demanding relief or assistance; urgent need."

When tested by the evidence, these general definitions of the proviso's pivotal words demand that we affirm the Director's resolution. So do legal definitions. Space prohibits a review of all the evidence and law bearing on this point, so we shall set forth merely some of the important facts and principles which impel our conclusion.

**First,** the segment proposed to be relocated, with its narrow bottleneck bridge, its twisty course (there are approximately six sharp or ninety degree angle turns and some slight curves), its obstructive, intersecting streets (approximately fifteen), its numerous private driveways emptying into the highway, and its busy business districts—all within an approximate distance of a little over a mile—is literally a **traffic dam** holding back the stream of traffic during extensive critical hours.

**Second,** it is no answer to say that there is no traffic jam at 2:00 A. M.

or 4:00 A. M. or some other time. Few of the countless improvements we now have could have been made if tested only by demands of wee morning or off hours. It is sufficient if there is regular substantial jam at critically important hours.

**Third,** the problem has gray hairs hanging on it. It has dragged through almost a third of a century. An over-patient public is entitled, to an over-due solution. As far back as 1928 a competent engineering study recognized that there was traffic congestion on this bridge. The report of the Bureau of Public Roads in that year sore-thumbed this bridge as one of the most seriously congested sections in our community. The reason given by the report was:

"During peak hours of traffic the capacity of this bridge is greatly exceeded and vehicle speed is reduced to a minimum principally because of the series of turns in the routes approaching and leaving the bridge and congestion at both the east and west approaches."

**Fourth,** this highway segment has fallen down on its job of accommodating the traveling public. The traveling public to be accommodated by it are the members of the public at large who want to travel over it. 18 Am. Jur. (Eminent Domain) 668-69, 685-86, secs. 40, 58. It was established by the testimony of the expert witness Carl L. Erb that:

"In all of our studies in connection with the traffic portion of this analysis, one thing was very evident, that there was an enormous reservoir of traffic on both the east and west sides of the river that would like to cross in this area. But the present bridge was so restrictive that there had been no growth whatever in the traffic across the Rocky River in this area. In other words, the bridge was loaded to capacity and there just could be no further additions accommodated. * * Most of the other highways in Ohio have increased in traffic volumes anywhere from 5, 6, 7 percent per year in a fairly uniform rate. That has not been the case in this area where there has been a little growth; no appreciable growth, largely because the capacity was not there to accommodate that growth."

**Fifth,** the term "necessity" does not mean indispensable, but rather, appropriate or fitting to the particular instance. In **19 O. Jur. (Eminent Domain) 426-427, sec. 18,** it is said:

"* * the term 'necessity' does not mean indispensable, but rather, appropriate or fitting to the particular instance. Such necessity relates to the nature of the property and the uses to which it is applies. It is enough to establish a public necessity when it appears that lands are necessary for such a work, without going further and showing that it could not be constructed without the use of the particular property sought to be appropriated."

Same: 39 C. J. S. (Highways) 1035, sec. 99.

**Sixth,** the Director's Proposal greatly shortens the distance between the two extreme points of the proposal. It saves about 2300 feet. It is approximately one-third shorter than the old route. Shortening of distance is a proper factor to be considered. 40 C. J. S. (Highways) 49, sec. 179; 39 C. J. S. (Highways) 1035, sec. 99; Wilkinson County v. State Highway Commission, 191 Miss. 750, syl. 1, 755.

Seventh, the Director's Proposal eliminates curves and corners. This is a proper factor to be considered. 40 C. J. S. (Highways) 49, fns. 21, 22; Wilkinson County v. State Highway Commission, 191 Miss. 750, syl. 1 ("eliminating curves * * and any good reason in the interest of through traffic").

Eighth, the Director's Proposal provides a fairly direct or straight route between the points its connects. This is a proper factor to be considered. 40 C. J. S. (Highways) 45, sec. 179.

Ninth, the Director's Proposal eliminates the impediments of many intersecting streets and private driveways.

Tenth, the Director's Proposal attains greater safety. This is a very important factor to be considered. 40 C. J. S. (Highways) 45, 47, sec. 179; State, ex rel. Huffman v. Shuff, 20 Oh Ap 432, 434.

Eleventh, the Director's Proposal fairly anticipates future need. This is a proper factor to be considered. 40 C. J. S. (Highways) 45, 55, secs. 179, 181; 18 Am. Jur. (Eminent Domain) 738, sec. 111.

Twelfth, there is urgent need for the particular proposal made by the Director. We have considered all of the alternate proposals. We do not say that there is not some merit in some phases of these proposals. We do not say that there are not some drawbacks in some phases of the Director's Proposal. There is hardly a pro without some con. There is hardly any proposition without both affirmative and negative aspects. That is no less true here. We have weighed them all intrinsically and against each other, and we find that the Director's Proposal is the best solution, the one urgently needed.

Thirteenth, we do not subscribe to the theoretical proposition that, if there were a highway problem in urgent need of solution and if there were three solutions all equally good, the Director could not proceed under the proviso and pick one of the three because it "alone" wasn't needed. Such a position is unreasonable and legally unsupportable. In 19 O. Jur. (Eminent Domain) 427, sec. 18, it is said:

"* * it is no objection to the exercise of the power that other lands, equally feasible, can be acquired by purchase."

See also, State ex rel. Huffman v. Shuff, 20 Oh Ap 432, 434-35. In 18 Am. Jur. (Eminent Domain) 735, sec. 108, it is said:

"The landowner may not object merely because some other location might have been made or some other property obtained which would have been suitable for the purpose."

See also, 2 Lewis, Eminent Domain (3rd ed., 1909) 1068, sec. 604.

Fourteenth, our conclusion is supported by the expert testimony of skilled traffic and highway witnesses who are nationally known in their field. We have great respect for Lakewood's witnesses but, in our humble opinion, they do not begin to match the Director's expert witnesses in training or experience. It is the same difference that one finds in a highly specialized field, say like brain surgery, between the general practitioner and the skilled specialist.

In conclusion, we are not unmindful that the Director's Proposal will work hardship on some people. Progress generally does. To those who would criticize residents of Clifton Park for opposing the proposal,

let it be said that it is never easy to be uprooted from one's home, and that there are few who would not prefer to see a highway go elsewhere than over their hearthstone. Any relocation proposal here would hurt someone—perhaps humbler homes. In calling for sacrifice, the law makes no distinction between the high and the humble. Neither is it easy for a judge to hand down a decision that will hurt friends, but he must decide as he sees it according to the law and evidence, otherwise he would not be fit to wear a judge's robe.