PUBLIC SERVICE COMMISSION, Appellant, *v.* METRO TAXI-CABS, INC., Appellee.

No. 12081. Submitted February 29, 1960.—Decided June 8, 1961.

*J. B. Fernández Badillo, Secretary of Justice, Edgar S. Belaval, Assistant Attorney General,* and *Marcilio B. Carrasquillo, Nellie Ortiz Torres, Helios A. Zeno Villafañe,* and *Roberto Rivera Escalera* for appellant. *F. Fernández Cuyar* and *Luis Tirado Géigel* for appellee.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

The Metro Taxicabs, Inc. appeared before the Public Service Commission asking permission to increase in 20 units its number of taxicabs. It alleged that it had 40 units working and that jointly with its service for general transportation, it gave special service under an exclusive concession by contract with Pan American World Airways, Caribe

Hilton Hotel, Condado Beach Hotel, La Rada Hotel, Camp Buchanan Military Post and the Isla Grande and International Airport, being compelled to have a certain number of units in the substations which it maintained at said places, at the Jack's Club and at others, and that the units it had for distribution in regards to all said places of service were insufficient, particularly in view of the increase in tourism and the more generalized use of the taxi. Because of the greater demand of such services, and to adequately meet such demand, it needed to operate the additional 20 units it was requesting. The Public Service Commission held hearings upon said request and the petitioner presented the testimony of the following persons:

BILL HARRIS. Testified that he is the Assistant Manager and Director of Transportation at the Caribe Hilton Hotel. By means of a contract, the Hotel granted the Metro the exclusive right of transporting in its taxicabs its employees and guests, providing the necessary space within its property, so that the Metro could park its cabs, excluding all other cabs. They originally required the Metro to have available 15 units, but in view of the increase in the demands they needed a minimum of 20 to 25 units. In exchange for said exclusive concession the Metro paid the hotel a fixed compensation. When the assigned cabs were not sufficient, the porter at the Caribe Hilton, paid by the Metro, would call the other stations of said company asking for cabs, and in the majority of cases they were busy. No other taxicabs were used in said cases because it would have been a violation of the contract of exclusiveness. Although the service was good, when a guest came down and was unable to find a taxi, the witness would receive a call, this occurring quite frequently.

A. DALE AGEE. Testified that he is the Chief of the Aviation Division of the Transportation Authority [Port Authority]. The Metro had an exclusive concession from the Authority to transport its passengers by taxi. It re-

quired 21 units available at the Airport, and if more were needed at a certain moment the Metro should ask for them. The contract of exclusiveness was granted by bids.

BLANCA B. DE TIRADO. Testified to be the General Manager of the Metro, in operation since 1946 under a franchise which granted at the start 30 units, increased afterwards to 40; 5 additional ones for Camp Buchanan service, and 5 more for the Caribe Hilton contract. The company rendered service by special concession to the Hilton, to Pan American, to the International Airport, to Camp Buchanan, to the Condado, on a contract to be signed, La Rada and Jack's Club. In Buchanan she was offered the service of 20 "green cars" [1] which she took over and she needed more cars. The Hilton required 20 units, and she was not giving good service because of the Airport; the latter requested 21; 12 in Buchanan; 2 at La Rada; at Pan American she gave continuous transportation service to the crew every time they arrived, and she needed 4 cars daily.

Upon being asked by the President of the Commission as to whether she had made any contract with the Condado "without having the cars," Mrs. Tirado replied: "I made the petition, that is why it is pending. That is why we are requesting *because I would be unable to give service at the Airport.* You must realize that I stay until eight o'clock at night. I move from here to there. Go to that place, from the Caribe Hilton go to such other place. My boys really respect me. Agee has called me at four o'clock in the morning with an airplane at the airport and I have sent four cars to the airport and the boys obey and respect me."

As to the cars at Buchanan she testified that they could not leave the post at any time, and that the *"MP'S"* had orders to arrest them if they would see them leave. As to the 21 cars she must have for the Airport, Mrs. Tirado an-

---

[1] The trial court explained in its opinion that "green cars" meant vehicles that the military personnel used exclusively for official use.

swered: "Yes, I have already my fleet to start at 3:30 at the Airport, check at the Caribe to see how many departures there are, if there are any possible departures. In the morning they drink their coffee, have their breakfast and go to the Airport directly, they go after breakfast so that they do not waste any time at home. There they have breakfast and leave for the Airport at five in the morning. The first plane arrives and there is my fleet, to the Caribe Hilton those that come from there with the first plane, they stop at the Hilton because all passengers come to the Hilton or to the Condado."

"Q.—How many cars do you have for the public service?

"A.—*Practically none.*"

In addition, the Metro serviced the ships from the Puerto Rico Coal every time they arrived. Finally the witness stated: "I believe that with those 60 units, *I can manage pretty well.* Right now I can tell you where each one of my drivers is and in which car he is."

ANDREW MONTEATH. Testified that he is the Manager of the Station in charge of the service to Pan American at the International Airport. They hired the Metro services for the transportation of passengers, its crew and employees. They did not use the services of any other company. Sometimes there was a delay and they had to wait sometime because there were not enough cars at the Airport.

ALBERTO LEBRÓN, Manager of Traffic and Sales of *Eastern.* He testified that his passengers traveled in the Airport's taxis which belong to the Metro and that there were no complaints, except for the lack of cars at times. He asked extra service of taxis from the company servicing the Airport. In answer to some questions by the President he stated that the tendency was towards an increase in the number of passengers "and if a company of taxicabs has the exclusiveness at the Airport I believe it should have more than enough."

AUGUSTO ARROYO, Major in the Army at the transportation Office of Fort Buchanan stated that the Metro had two

contracts with the Post for the local service from one place to another within the post. One contract was for the common use, which the individual paid within the military area, and the other was the official use for which the Army paid. The general service was contracted by bid. Although they did not check the service directly, they received complaints of lack of cars which were not sufficient for the internal demand of the Post. The outside cabs could not enter with their passengers, but had to leave them at the entrance and the local taxi would take them to the desired place. As to the official service, it required two taxis to be kept at the main gate, two at the "*Motor Pool*", two at the Post Commander's office and two at Headquarters. They had between 12 to 15 units for the common use. He explained that the situation had become serious in the last four months, this having some relation with the opening of the International Airport, and that this brought about a meeting of the commanders with the company. He said that he was sent by the Commander to testify about the needs for the service, explaining that his testimony was in regards to the needs for the service within the Post.

BARBARA PRESTON, Manager of Reservations of the "British" Airlines said that she used the Metro service for her employees and crew and sometimes there was a delay due to the lack of taxis at the Airport.

Besides the oral evidence, the petitioner introduced a letter of August 1, 1955 sent by the Chief of the Aviation Division of the then Transportation Authority, informing it that he had many complaints due to the public's impossibility of obtaining a taxi at the most critical hours; it mentioned the pending request before the Commission and that he expected a prompt arrangement. Another communication from the Provost Marshal at Fort Brooke, of October 10, 1955, reporting that the Metro was the only company that had fulfilled the Post regulations referring to sufficient insurance and operation within the Post, and that the only complaint was the

slow and at times inexistent service due to the lack of taxicabs. They asked for a better service for their personnel.

There was evidence opposing the request from taxi owners and other companies interested in the business. It was to the effect that there was an excessive number of taxis for the public's needs in general, and due to this they were not earning enough. The petitioner's problem was the result of the monopoly it had on the transportation by taxicabs.

Finally the record shows, as stated by its President, that the Commission did not intervene in said contracts of exclusive transportation, and when this request was presented there was already an order from the Commission freezing the number of taxicabs in general and holding out the granting of new franchises.

In the light of the request and the evidence, the Commission denied the requested increase of the number of units. Among other things it stated the following:

"From an analysis of the evidence presented by the petitioner we conclude that the service it has been rendering is efficient and satisfactory. This being a true fact, the public's convenience and needs have not been established to justify an increase in the petitioner's fleet. Irrespective of this, we understand that to decide this petition we must determine whether the increase in units would benefit the public in general. We have previously stated in this Order that the basic ground for requesting an increase of twenty (20) units is the need that the petitioner has for fulfilling certain alleged contracts, agreements or obligations contracted with different entities. At the first hearing of this case, Mrs. Blanca Tirado, General Manager for the petitioner, stated that she practically had no taxicabs for the public service. (See transcript of record page 22.) All the witnesses presented by the petitioner are persons who would benefit because they are related in one way or another with the alleged contracts. . . . .

"The public convenience and need is not established by the mere fact that a company for the public service can not fulfill certain contracts made by it, freely and voluntarily with certain entities. If the petitioner made said contracts it was because

it was in a position to meet them. It should not make contracts which it is unable to fulfill and subsequently request from this Commission the means to fulfill them.

"We are of the opinion that when a franchise or certificate of convenience and need is granted to a public service company, it should balance or adjust its operations and facilities, in a way that it may render an efficient and adequate service. If it fails to do so and accepts obligations that curtail or impair the service the proper thing to be done is the rescission of the contract of service by the other contracting party for non-performance.

"The Commission in the present case has not intervened with the contracts executed by the petitioner. Likewise we are not in a position to amend the franchise so that it may fulfill the same.

"The concept of public interest does not entail the right of a small group of usuaries of the service to demand that said service be rendered by a particular company. The right that exists and which should be safeguarded by the Commission is that the public in general may depend on said service; that the same be adequate and economic.

"An amendment to a franchise requesting an increase in the number of vehicles granted, is allowed after the convenience and need of the service by the public in general has been affirmatively shown and not by proof of the pressure exerted by certain groups. Nor are we in a condition to grant concessions because any public service company has accepted contractual obligations which it cannot fulfill because it has extended the radius of its operations without considering the facilities it has for rendering the service. This is so, particularly when it has ignored this agency when assuming said obligations. The Commission is not supposed to make concessions in cases like the present one, notwithstanding how advantageous and lucrative they may be for the petitioner. In a proceeding for the granting of a franchise, certificate, or right or privilege or in which an increase in the units, already granted, is requested, such as the present case, the Commission must decide the issue on the basis of the existence of the convenience and needs of the public for said service, and the wishes of the petitioner and its witnesses of doing more business is not a factor to be considered.

"The existence of the public convenience and needs is essentially an administrative question and to determine it we must consider the following factors:

"FIRST:—Whether there is a public need which substantially affects the majority of the public;

"SECOND:—Whether the existing carriers can meet said need; and,

"THIRD:—Whether the concession based on the need and convenience would undermine or affect the operations of the carriers to the prejudice of the public interest.

"Let us see which factors were proved by the evidence presented by the petitioner as well as its oppositors.

"We have extensively argued that neither petitioner's request nor the evidence has established that the public in general will be affected or benefited substantially if this Commission grants the twenty (20) additional taxicabs. On the contrary, the oppositors proved, beyond any doubt, the existence of the last two factors.

"Wherefore, this Commission DENIES the petition for an increase in the fleet filed by the petitioner in the above-entitled case."

The petitioner appealed to the Superior Court, San Juan Part. Act No. 70, 1917 (II), § 78—27 L.P.R.A. § 227. After hearing the parties, the trial court rendered judgment reversing the Commission. After making a detailed exposition of the evidence, it approached the problem thus:

"After thus analyzing all the evidence that the respondent court had before it, we must determine whether the petitioner-appellant's request for obtaining twenty additional units of service lies, or whether the opposition made against it is tenable. Did the appellant properly justify its request for the need of an increase in its fleet of operation, on the basis of constant demand for increase of its generalized services of a public character, consisting in the transportation of passengers by taxicab within the metropolitan area? We believe that we must consider that it unquestionably did so. Was any real opposing ground in that respect established? We believe not."

We do not believe that the trial court assumed the correct position. That was the correct approach for the

Commission itself. Its function was one exclusively judicial: to determine whether in the light of the facts and all other circumstances present in the certified record to be weighed, the decision of the Commission was or was not reasonable, in conformity with the law and based on competent evidence. Sections 83 and 85 of Act No. 70 of 1917 (II)—27 L.P.R.A. §§ 232, 234. The Court shall not substitute the Commission. *In the Matter of Herminia Colón de Semidey*, 59 P.R.R. 247, 252-53; *Municipality* v. *Public Service Comm'n*, 51 P.R.R. 362, 364-65; *Havemeyer* v. *Public Service Commission*, 45 P.R.R. 677, 678, affirmed in *Commission* v. *Havemeyer*, 296 U.S. 506. *Cf. Pub. Serv. Comm'n* v. *Super. Ct.; Star Taxicabs, Int.*, 78 P.R.R. 229, 243-44; *Santiago* v. *P. S. Comm'n et al.*, 37 P.R.R. 467, 475-76; Pond, *A Treatise on the Law of Public Utilities*, Vol. 3, pp. 1925 *et seq.*

In *Commission* v. *Havemeyer, supra*, the Supreme Court, affirming this Court and reversing the Court of Appeals (74 F.2d 637) said: "On the appeal the district court was not authorized to substitute for those of the commission its own views as to what action would be just or ought to be taken, or to perform any legislative, executive or administrative function. Its only jurisdiction was to decide upon the record certified to it by the commission whether the order was (1) reasonable, (2) in conformity with the law, (3) based upon incompetent evidence. 'Reasonable' as here employed means not 'capricious,' 'arbitrary' or 'confiscatory.' Whether the order of cancellation was reasonable in the sense that it did not transgress permissible limits is a question of law.....
The permissible scope of the determination and judgment of the court is significant. It may only decide the questions of law raised by the appeal and affirm or reverse the order or remand the record to the commission for further action. It is without authority to amend or modify an order of the commission. The jurisdiction and duties of the supreme court and Circuit Court of Appeals are similar in all respects to those of the district court. Neither has any power or

function other than what is strictly judicial." *Cf. A. T. &
Co.* v. *United States*, 299 U.S. 232, 236 (1936) ; *Fed. Power
Comm'n* v. *Pacific Co.*, 307 U.S. 156, 160 (1936) ; *Board of
Trade* v. *United States*, 314 U.S. 534, 548 (1942) ; *Securities
Comm'n* v. *Chenery Corp.*, 332 U.S. 194, 207 (1947).

Having assumed the aforesaid position, the court went
into arguments and considerations based on its own apprecia-
tion of the matter involved, which consideration could rather
voice a dissenting vote within the Commission itself. It con-
cluded that in its opinion a considerable and progressive in-
crease of passengers which required transportation by taxi
as a result of the increasing volume of visitors from the Air-
port to the hotels (fact which was proven by the evidence)
was established; and also, that because it had concessions
for the exclusive transportation by taxi, the Metro found that
its capacity had diminished to meet the requirements thereof
and did not have the sufficient number of vehicles which it
needed by no less than 20 additional units and 60 in total;
that although the Metro service was satisfactory, the evidence
had shown that it was insufficient because of the lack of more
vehicles; that in an *unreal* approach of the problem, the Com-
mission had parted from the erroneous premise that the con-
venience and public needs which would justify the increase
in units had not been established, based on the untenable
appreciation, *alien* to the facts, that the request was primarily
based on the petitioner's need of fulfilling certain contracts,
agreements, obligations contracted with different entities. [2]

The court concluded that the basic question raised was not
the need to meet any contractual obligation, despite the alleged

[2] Such appreciation by the Commission is amply supported by the record.
Mrs. Tirado's testimony leaves no room for doubt on that point, as well as
other evidence which shows that petitioner was waiting for the outcome of
this petition before the Commission in order to solve its problems of insuf-
ficiency in the exclusive contracts. From the evidence it may be reasonably
concluded that the Metro was not servicing the public in general, but only
the public included within its exclusive transportation contracts, and in
the Buchanan case, within an area of private interest.

contract in that respect, but the need of rendering effective service of transportation of passengers "which pursuant to concessions established by agreements with the respective companies which may authorize them," it was carrying on; that the opposing evidence did not militate against the need that petitioner had for said vehicles; that it was not proper to suppose that the Commission, in the sound and conscientious exercise of its discretional power, would not have allowed a company to spread its means of operation if public demand had been proven; and that the individual passengers and not the aforesaid companies were the usuaries of the taxi service. That the Commission should have given way to the petitioner's request fully justified and in failing to do so, it had "ill used its discretion."

Within the permissible limits for review, as has been noted, the trial court should not have reversed the Commission on the basis of its own approach of the problem differently from how the Commission understood it. It would be beyond the realm of possibilities to try to condense in a definition what is reasonable. But in situations like the present, many acceptable concepts have been pronounced. Reasonable in such a case has been said to be in accordance with reason, the appropriate and adequate thing, that which molds itself to the circumstances, not necessarily the best, but the appropriate and convenient. *Cf. Ex parte Hall*, 195 Pac. 975, 976-77 (1920).; *Carroll* v. *California Horse Racing Board*, 93 P.2d 266, 275 (1939); *Le Cuno Oil Co.* v. *Smith*, 306 S.W.2d 190, 195 (1957); *City of Lakewood* v. *Thormyer*, 154 N.E.2d 777, 791 (1958). Or as was said in *Havemeyer*, a non-capricious decision.

It is true, as found by the court, that ultimately the usuaries with insufficient services were the individual passengers. But the delay suffered by those passengers who were part of the public, was due to the fact, under the circumstances of this case, that together with the public interest, there was involved a private interest between the petitioner

and those entities, which derived a mutual material benefit from the exclusive concessions of transportation. The complaints that the witnesses alleged to have received from their guests because of lack of service, were not because the Commission had not provided the community with the necessary number of taxis, but because they had imposed on themselves a limitation by virtue of a contract of not using the other vehicles available. Studying objectively the problem created, the same actually arose from the fact that for whatever reasons they had, the Commission did not intervene with said exclusive contracts of vehicles which it had authorized to give public service—which to a certain degree seems strange, if one considers how intimately close these contracts and the effects thereof are with the Commission's police power—so as to avoid what was precisely happening in this case.

Based on the evidence in record and other circumstances taken into account, the Commission's decision should not have been disturbed. Upon passing on the matter the Commission was not bound to approach the same with a view exclusively of the problem that this taxi company had as a result of the many obligations which it assumed without the Commission's intervention, but taking into account the entire general public interest involved in the transportation by taxicabs.

The judgment rendered by the Superior Court, San Juan Part is reversed and a new judgment is rendered affirming the decision of the Public Service Commission.

Mr. Justice Belaval, Mr. Justice Hernández Matos and Mr. Justice Rigau did not participate.