BOARD OF TRADE OF KANSAS CITY ET AL. *v.* UNITED STATES ET AL.

No. 143. Argued November 18, 1941.—Decided January 5, 1942.

*Messrs. M. W. Borders* and *Samuel J. Wettrick* for appellants.

*Mr. J. Stanley Payne,* with whom *Assistant Solicitor General Fahy, Assistant Attorney General Arnold,* and *Messrs. Smith R. Brittingham, Jr.* and *Daniel W. Knowlton* were on the brief, for the United States et al.; and *Mr. Frank A. Leffingwell* for the Texas Industrial Traffic League et al., appellees.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

We have before us on this appeal orders embodying a series of determinations made by the Interstate Commerce Commission after inquiries into the grain rate structure stretching over a period of twelve years. The plaintiffs are millers, elevator companies, boards of trade, grain exchanges, and other business interests in Kansas City, St. Louis, Omaha, St. Joseph, Atchison, Leavenworth, and Minneapolis, the great grain centers known in the trade as "primary markets." The Commission's orders, they complain, create an unlawful discrimination under the Interstate Commerce Act, §§ 1 (5), 2, 3 (1), by prohibiting the interruption of shipments of grain for the purpose of being stored, marketed, or processed—technically characterized as transit privileges—at these primary markets on the lower rates under which these privileges are available at competing interior points ·(*i. e.,*

grain centers other than primary markets). The District Court dismissed the complaint, 36 F. Supp. 865, and the case is here on appeal. Judicial Code § 210; 28 U. S. C. § 47 (a).

As one phase of the effort to relieve agricultural distress, Congress in 1925 by the Hoch-Smith Resolution directed the Interstate Commerce Commission to make a thorough investigation of the rate structure of common carriers "in order to determine to what extent and in what manner existing rates and charges may be unjust . . . or unduly preferential, thereby imposing undue burdens, or giving undue advantage as between the various localities and parts of the country, the various classes of traffic, and the various classes and kinds of commodities, and to make, in accordance with law, such changes, adjustments, and redistribution of rates and charges as may be found necessary to correct any defects so found to exist." 43 Stat. 801; 49 U. S. C. § 55.

Accordingly, on September 30, 1926, the Commission instituted a comprehensive investigation into the rates and practices affecting grain and grain products in the Western District.[1] The Commission called its proceeding "unusual," involving as it did "three score and more of major issues, affecting every part of a vast territorial domain, each of which would ordinarily present a case of more than average importance." 164 I. C. C. 619, 697. Extensive hearings were held, and on the basis of a huge record of some 53,000 pages of testimony, including 2,100 exhibits, 20,000 pages of memoranda, exceptions, and oral arguments, the Commission on July 1, 1930, issued a report and order prescribing maximum rates for grain and grain products. 164 I. C. C. 619. A supplemental report and order were issued on April

---

[1] The Western District is defined as the area "on and west of the Mississippi River, west of Lakes Superior and Michigan, and west of and including Illinois."

13, 1931. 173 I. C. C. 511. Because the Commission did not take evidence relating to the drastic changes in economic conditions due to the depression occurring between the close of its hearings and the date of its orders, this Court set aside the orders. *Atchison, T. & S. F. Ry. Co.* v. *United States,* 284 U. S. 248. New and extensive hearings were thereupon held, and on October 22, 1934, the Commission in an elaborate report affirmed some of its earlier findings and modified others. 205 I. C. C. 301. Upon further consideration of the record, the Commission issued a supplemental order to remove discriminations between interior points. 215 I. C. C. 83. Dealers at the primary markets thereupon filed formal complaints seeking modification of that part of the Commission's orders which differentiated between transit privileges at primary markets and those at interior points. Hearings upon these complaints produced more than 7,000 pages of new testimony and over 250 exhibits. On July 27, 1937, the Commission authorized, but did not require, the carriers to meet the requests of the primary markets. 223 I. C. C. 235. The carriers having declined to act on this authorization, the Commission was petitioned to enter a mandatory order. Proceedings were reopened, new arguments were heard, and on July 12, 1938, the Commission found that the prescribed rates did not subject the primary markets to any "undue prejudice and disadvantage." 229 I. C. C. 9, 16. Upon reconsideration this conclusion was affirmed on March 13, 1939. 231 I. C. C. 793. To upset these findings and to strike down the orders based upon them the present suit was filed.

Since the transit privilege is at the core of this litigation, a brief exposition of its mechanics and manipulations becomes necessary. The privilege of transit enables grain to be shipped from point A to point B, there to be stored, marketed, or processed, and later

reshipped to point C at a rate less than the combination of the separate rates from A to B and B to C. See Transit Case, 24 I. C. C. 340; *Atchison, T. & S. F. Ry. Co.* v. *United States,* 279 U. S. 768, 777–79; Locklin, Economics of Transportation (1935) 122–23, 629–31. The shipper pays the local rate on the inbound shipment to the transit point, B in our illustration. A receipted freight bill specifying the point of origin, the rate paid, and other pertinent data, is recorded with the transit bureau as evidence of intention of further transportation of the inbound grain or its equivalent. When the outbound shipment is tendered to the carrier, the freight bill is surrendered in order that the shipper may obtain an outbound rate lower than that which he would otherwise be compelled to pay. The privilege belongs, as it were, to both the grain and its shipper. "The benefit attaching to grain shipped into the primary market is commonly so broad that it is transferable not only to another owner of the same grain, but to like grain coming from the same country point." *Atchison, T. & S. F. Ry. Co.* v. *United States,* 279 U. S. 768, 778.

This privilege was available in the primary markets under two different rate schemes: (1) the "overhead through rate" and (2) the "rate-break combination."

(1) An overhead through rate is the rate from an originating point to the final destination, or to a gateway like Chicago, via a particular point. Thus, on a shipment of grain from Enid, Oklahoma, to Chicago via Kansas City, the overhead through rate was 38.5 cents per hundred pounds. Under this rate, grain reaching Kansas City could receive the various privileges of transit upon payment of 23.5 cents (the local rate from Enid to Kansas City) upon the inbound shipment, and the difference (known as the "transit balance") between the overhead through rate, 38.5 cents and the 23.5 cents inbound rate, upon the outbound shipment.

(2) On a "rate-break" basis, however, grain moved on a combination of the local or flat rate from the originating point to the primary market and the "proportional" rate from that market to a gateway or the final destination. The primary markets therefore came to be known as "rate-break" points. The "proportional" rate, representing an average of transit balances under overhead through rates, was designed to offset the competitive advantages of lines going through rate-break points as against lines starting there. The significance of the rate-break combination lay in the fact that for many points of origin there were no overhead through rates. In the above example, the proportional rate on outbound grain shipments from Kansas City to Chicago was 17.5 cents. The applicable rate on a shipment of grain from an originating point having no through rate to Chicago via Kansas City, with or without transit at Kansas City, was a combination of the local rate to Kansas City and the proportional rate from Kansas City to Chicago.

Thus, the difference between the two systems permitting transit at primary markets was the rate at which the outbound traffic moved. Under the rate-break combination the outbound shipment moved at the proportional rate; under the overhead through rate, it moved at the transit balance. The availability of these two rate bases, the Commission found, gave rise to serious discriminations: "Whether outbound shipments are at proportional rates or transit balances depends upon the selection of the inbound freight bill. If the inbound freight bill covers a shipment from an origin point from which there is no overhead route with transit to final destination, the outbound shipment is at the proportional rate. But grain from a point from which there is no overhead rate with transit can, under present practice, be substituted for grain from a point from which there is such an overhead rate with transit, and can be forwarded, upon pres-

entation of the inbound expense bill covering inbound transportation from the latter point, at the transit balance due that expense bill." 164 I. C. C. 619, 634.

"The uncertainty in advance as to the outbound basis of charge arises from the dependence of that charge upon a check of the individual shipper's range of inbound billing. The outbound charge will be a transit balance if the inbound freight bill surrendered covers a shipment from an origin from which there is a one-factor through rate less than the rate-break combination, and will be the higher proportional rate if the inbound freight bill surrendered covers a shipment from an origin from which there is no such one-factor through rate. Transit balances will vary with the measure both of the through rates and of the inbound rates to the transit point.

"The advantage to the user of the transit balance over the user of the higher proportional rate is evident, and increases in the ratio of the increase in the storage capacity of the respective cash-grain dealers at the rate-break markets. In other words, the greater the storage capacity the wider the selection of inbound billing and proportionately more transit balances." 205 I. C. C. 301, 335.

In the judgment of the Commission these practices "tended to disrupt the rate-break combinations, disorganize the general rate structure, make uncertain in advance the outbound basis of charge, give an undue preference to the users of transit balances over the users of proportional rates, depress the price of grain at the rate-break markets and, by direct reflection, at the country points, and reduce the revenues of the carriers." 205 I. C. C. 301, 334.

Thus, the issue before the Commission was "whether the rates through the primary markets shall be made on the combination of flat rates to and proportional rates from the markets exclusively, or in part, or at all." Put-

ting in the balance all the complex and conflicting interests, the Commission reached these conclusions: "Just so long as transit balances remain a substantial factor in the adjustment of rates from the primary markets, just so long will there be undue preferences between outbound shippers, as well as general instability in rates resulting from shippers seeking the translation of transit balances into proportional rates. . . . The best interests not only of the primary markets, but of the producer, consumer, and carrier will be served by the fullest possible application of the rate-break combinations through primary markets." 164 I. C. C. 619, 644–45.[2]

Accordingly, it prescribed new rate-break combinations[3] and made them applicable to transit both at pri-

---

[2] The Commission specifically found that the adoption of the exclusive rate-break combination at the primary markets would give the markets substantial competitive advantages over interior transit points: "The proportional rate is applicable over all outbound lines upon surrender of an inbound freight bill covering an inbound shipment by rail, whether the transportation through the rate-break market is over a reasonably direct route or not. It is the equivalent in all respects, and more, of a local rate. . . . It is designed for the final gathering in by the rate-break market, for through transportation at less than the combinations of local rates that would otherwise apply, of grain not procurable under one-factor through rates less than the rate-break combinations (and resulting transit balances less than the proportional), because of the limitations on out-of-line and back-haul movement incident to the usual application of the one-factor through rates only over reasonably direct routes, and because of the further usual requirement of outbound shipment from the transit point over the rails of the inbound carrier. The proportional rates therefore open up to the rate-break markets the widest possible range of originating and distributing territory and afford, together with the larger number of carriers usually found converging inbound to and radiating outbound from the rate-break market, in the direction of the normal flow of the grain traffic, a decided advantage to that market over the interior transit point." 205 I. C. C. 301, 340–41.

[3] The Commission revised existing rate-break combinations, reducing both the inbound flat rates and the outbound proportionals, and ordered that the prescribed rate-break combinations be made the

mary markets and at interior points on routes passing through such markets.[4]  The exclusive rate-break combinations were not made applicable to interior points not on routes passing through rate-break markets because the rate-break combinations had no relevance to these points. 164 I. C. C. 619, 645; 173 I. C. C. 511, 516–17.

A concrete illustration will rob this railroad jargon of its mystery.   The through rate over numerous routes from Kansas City to Chicago was 16 cents.   Some of these routes pass through Omaha, from which the proportional rate was also 16 cents.   Other routes from Kansas City to Chicago do not pass through Omaha.   Interior points like Falls City and Nebraska City, which are on routes through Omaha, had to pay 6½ cents, the local rate to Omaha, plus 16 cents, the proportional rate from Omaha to Chicago.   But other interior points lying between Kansas City and Chicago on routes not passing through Omaha were required to pay only the 16 cents through rate.   The net result was that interior points on routes passing through rate-break markets were placed at a substantial competitive disadvantage with interior points not on such routes.

Dealers at the interior points on routes passing through rate-break markets like Omaha petitioned the Commission to modify its orders so as to remove this discrimination between interior points.   They urged on the Commission that, inasmuch as the fundamental purpose of the rate-break combinations was the establishment of uniform proportional rates on outbound shipments from

---

exclusive basis of charge upon grain shipments moving through or stopping for transit at primary markets, and that overhead through rates less than the prescribed rate-break combinations be cancelled. 164 I. C. C. 619, 645.

[4] "The restriction is laid on the intermediate points other than the market, as well as upon the market, in order not to discriminate against the market in favor of the other intermediate points."   173 I. C. C. 511, 516.

primary markets, this purpose would not be frustrated if, in order to meet the lower through rate over competitive routes, transit on the through rate were permitted at interior points on routes through rate-break markets. The Commission found that the requested modification would remove the discrimination between interior points without subjecting the primary markets to any new substantial competitive disadvantages. 215 I. C. C. 83, 92–3. It found that under transit on an overhead through rate, dealers at interior points operated under important competitive disadvantages. The through rates were applicable only on "reasonably direct," not "markedly circuitous" routes, and outbound shipments from the transit point were usually limited to the rails of either the inbound carrier or a carrier participating with it in a joint rate via the transit point. Dealers at rate-break markets, on the other hand, were free from such restrictions as to circuity of routes and choice of outbound carrier. The proportional rate was applicable to all lines from primary market to destination, regardless of the inbound shipment's point of origin. The Commission found this to be a "substantial advantage to the transit operators at the rate-break markets over the transit operators at the interior transit points." 215 I. C. C. 83, 91. Accordingly, it modified its previous orders so as to permit transit at interior points on routes passing through a primary market "on the basis of a lower rate in effect over a competing route between the same points." 215 I. C. C. 83, 93.

To give this order practical application: At all interior points lying on routes from Kansas City to Chicago, transit privileges were available at the 16 cents rate, while shipments stopping for transit at primary markets along such routes, e. g., Omaha, Atchison, Leavenworth, and St. Joseph, could move only at the rate-break combination of the $6\frac{1}{2}$ cents inbound rate and the 16 cents outbound proportional rate.

The crux of this litigation is the validity of the differentiation between primary markets and interior points thus made by the Commission in the setting of the whole history of grain rate regulation.

Dealers at the primary markets complained against this differentiation. The Commission again canvassed the perplexing factors of the tangled problem before it. After pointing out that at the earlier stages of the grain rate inquiry "especially the markets" had supported the system of "rate-breaks at market points and overhead rates with transit at local points," the Commission observed: "No extensive rate structure can be made perfect nor can any rate structure be made permanent in any real sense in a changing world. . . . The two *Grain cases* together have demonstrated the impossibility, even on the part of those most experienced, most competent, and most expert, of seeing in advance the consequences of the particular changes in rates and practices here under consideration. Apparently nothing but experience can furnish a demonstration, and even the demonstration of experience may not prove to be conclusive unless it can be had on a scale sufficiently large and at intervals of time sufficiently close, and under substantially similar conditions." 223 I. C. C. 235, 245–46. It took occasion to recall these guiding considerations from its first report: "It would be impossible to take any comprehensive action without adversely affecting certain of the conflicting interests upon this record. Nothing but experience can demonstrate what the effect will be regarding certain of these issues. . . . All parties should cooperate to make careful note of the effect upon their interests, with the view to bringing to our attention from time to time, after a reasonable trial, those situations which may require further consideration." 164 I. C. C. 619, 698. To yield to the wish of the dealers of the primary markets would, the Commission found, work "a hardship upon the milling

industry at many intermediate points, with little or no benefit to the markets, which would still be at a disadvantage in competing with other rate-break markets and interior points on lower-rated routes." 223 I. C. C. 235, 245. It concluded, therefore, that the record did not justify the mandatory order sought by the markets. Instead it authorized the carriers by appropriate tariffs. to make "restricted departures from the exclusive application of proportional rates at rate-break points for a limited period of time" upon condition that such departures "should be surrounded by such effective safeguards as will make it impossible to reestablish" the discriminations incident to the double system of rates at primary markets. 223 I. C. C. 235, 246.

The carriers having declined to act on this authorization, the markets again sought a compulsory order. Upon reargument, the Commission concluded that "the granting of the transit requested would break down the rate-break adjustment prescribed in the *Grain Case;* that said adjustment should be abandoned, if at all, only upon demonstration of its failure as a workable adjustment, over an adequate period of normal conditions in the grain trade; that such a test has not been given the adjustment." 229 I. C. C. 9, 16.[5] Accordingly, the Commission dismissed the complaints and withdrew its previous permission to the carriers voluntarily to establish the rates requested by the primary markets. After a second reargument the Commission adhered to this conclusion. 231 I. C. C. 793.

The appellants do not claim that the Commission's findings are devoid of proof or that they were reached without observance of appropriate procedures. Their claim, in

---

[5] To rescind the previous modifications, the Commission found, "would deprive these interior transit points of the same kind of transit accorded interior transit points on other routes and . . . would not materially benefit complainants, who would still be confronted with their major competition." 229 I. C. C. 9, 14.

substance, is that whatever benefits the double system affords the primary markets are natural advantages, and that to deprive them of these advantages works an unlawful discrimination.

The Act forbids the Commission to establish a rate structure which would give one transit point an "undue or unreasonable preference or advantage" and would subject another point to an "undue or unreasonable prejudice or disadvantage." But this does not mean that the law compels identity of treatment for like services at different places. It prohibits only "undue" or "unreasonable" discriminations. "Whether a preference or advantage or discrimination is undue or unreasonable or unjust is one of those questions of fact that have been confided by Congress to the judgment and discretion of the Commission . . ., and upon which its decisions, made the basis of administrative orders operating *in futuro,* are not to be disturbed by the courts except upon a showing that they are unsupported by evidence, were made without a hearing, exceed constitutional limits, or for some other reason amount to an abuse of power." *Manufacturers Ry. Co.* v. *United States,* 246 U. S. 457, 481; see *Nashville, C. & St. L. Ry.* v. *Tennessee,* 262 U. S. 318, 322; *United States* v. *Chicago Heights Trucking Co.,* 310 U. S. 344, 352–53.

The process of rate making is essentially empiric. The stuff of the process is fluid and changing—the resultant of factors that must be valued as well as weighed. Congress has therefore delegated the enforcement of transportation policy to a permanent expert body and has charged it with the duty of being responsive to the dynamic character of transportation problems. Cf. *Railroad Commission* v. *Rowan & Nichols Oil Co.,* 310 U. S. 573, 581–82.

The wisdom of the narrow scope within which Congress has confined judicial participation in the rate-making process is strikingly vindicated by the history of this

controversy. The Commission's laborious investigation into the grain rate structure disclosed that discriminations were inseparable from the operation, side by side, of two systems of rates allowing transit of grain at primary markets. This basic finding is not challenged. And it is this fact which created the problem for solution by the Commission. There was no ready answer either in law reports or in economic experience. Any solution had to rest on informed judgment. And judgment in a situation like this implies, ultimately, prophecy based on the facts in the record as illumined by the seasoned wisdom of the expert body. In this perspective, the Commission had several choices before it—but all inevitably rested upon trial and error. It might have established the overhead through rate as the exclusive basis of transit at primary markets. It might have banked on the exclusive rate-break combination. It might have abolished the privilege of free transit entirely. Of only one thing could the Commission be completely certain: no action could be taken without "adversely affecting certain of the conflicting interests." 164 I. C. C. 619, 698. Weighing the prospective gains and hurts which were part of all of the proposed remedies, the Commission decided upon the exclusive rate-break combination. It did so, however, with full recognition that the wisdom of its action had to meet the test of experience. Therefore, it treated its conclusion as part of a continuing process, and requested the parties to give the system which it adopted a "reasonable trial," contemplating such further consideration as the practical operation of the system would require. The Commission refused the modifications asked by the appellants because the rate-break adjustment was "entitled to a thorough test over an adequate period of normal conditions in the grain trade" and it had "received no such fair test up to the present time." To grant the re-

quested modifications would "break down the rate-break adjustment." 229 I. C. C. 9, 15–16. These findings are incontestable.

That the Commission itself was of divided mind in the successive stages of this controversy emphasizes that the problem is enmeshed in difficult judgments of economic and transportation policy. Neither rule of thumb, nor formula, nor general principles provide a ready answer. We certainly have neither technical competence nor legal authority to pronounce upon the wisdom of the course taken by the Commission. It is not for us to tinker with so sensitive an organism as the grain rate structure, only a minor phase of which is caught in the record before us. If we were to grant the relief sought by the appellants, we would be restoring evils which the exclusive rate-break adjustment was designed to remove— evils which, for all we know, would be far more serious than those complained of by the appellants.

What we have said sufficiently disposes of the suggestion that the orders of the Commission must be stricken down because they wipe out natural competitive advantages of the primary markets. A rate structure found to involve serious discriminations among shippers, carriers, and transit points alike, is hardly a manifestation of nature beyond the Commission's power to repair.

*Affirmed.*

Mr. Justice Roberts is of opinion that the decree of the District Court should be reversed.