The **COMMONWEALTH OF VIRGINIA**, Petitioner,

v.

**CIVIL AERONAUTICS BOARD**, Respondent.

**DEPARTMENT OF TRANSPORTATION OF the STATE OF MARYLAND** (successor in interest to the Mayor and City Council of Baltimore, Maryland, originally named as a Complainant before the Civil Aeronautics Board), et al., Petitioners,

v.

**CIVIL AERONAUTICS BOARD**, Respondents.

**Nos. 73–2070, 73–2076.**

United States Court of Appeals, Fourth Circuit.

Argued March 7, 1974.

Decided June 6, 1974.

Paul L. Reiber, Boston, Mass. (Andrew P. Miller, Atty. Gen., of Va., Vann H. Lefcoe and Henry M. Massie, Jr., Asst. Attys. Gen. of Virginia, on brief), for petitioner in No. 73–2070.

Frederick A. Ballard, Washington, D. C. (Francis B. Burch, Atty. Gen. of Maryland, J. Michael McWilliams and William M. Huddles, Asst. Attys. Gen. of Maryland, J. Cookman Boyd, Jr., John C. Smuck and Ballard & Beasley, Washington, D. C., on brief), for petitioners in No. 73–2076.

Alan R. Demby, Atty., Civil Aeronautics Board (O. D. Ozment, Deputy Gen. Counsel, Glen M. Bendixsen, Associate Gen. Counsel, Litigation and Research, Robert L. Toomey, Atty., Civil Aeronautics Board, Thomas E. Kauper, Asst. Atty. Gen., Carl D. Lawson, Atty., U. S. Dept. of Justice, Richard Littell, Gen. Counsel, Civil Aeronautics Board, on brief), for respondents in Nos. 73–2070 and 73–2076.

Nicholas Panarella, Jr., Asst. City Solicitor (Herbert Smolen, Asst. City Solicitor, John Mattioni, Deputy City Solicitor, Martin Weinbert, City Solicitor for the City of Philadelphia, on brief), for intervenor City of Philadelphia, in Nos. 73–2070 and 73–2076.

Herman F. Scheurer, Jr., Washington, D. C. (John J. McLaughlin, III and Shanley & Fisher, Washington, D. C., on brief), for intervenor Metropolitan Washington Board of Trade in Nos. 73–2070 and 73–2076.

Patrick W. Lee, Washington, D. C. (Jerry W. Ryan, James M. Burger, Reavis, Pogue, Neal & Rose, Washington, D.

C., on brief), for joint intervenors Pan American World Airways, Inc. and Trans World Airlines, Inc. in Nos. 73–2070 and 73–2076.

Harold E. Spencer, Chicago, Ill. (Thomas F. McFarland, Jr., Michael M. Glusac, Detroit, Mich., Richard L. Curry, Robert L. Hankin, Chicago, Ill., John P. Cushman, James J. Tedesco, Jr., Detroit, Mich., Belnap, McCarthy, Spencer, Sweeney & Harkaway, Chicago, Ill., on brief), for intervenors Chicago and Detroit Interests in Nos. 73–2070 and 73–2076.

Laidler B. Mackall, Richard P. Taylor, John W. Arata and Steptoe & Johnson, Washington, D. C., on brief for intervenors Massachusetts Port Authority and Greater Boston Chamber of Commerce in Nos. 73–2070 and 73–2076.

Francis A. Mulhern, Deputy Gen. Counsel, Newark, N. J., on brief for intervenors The Port Authority of New York and New Jersey in Nos. 73–2070 and 73–2076).

Before WINTER, BUTZNER and FIELD, Circuit Judges.

WINTER, Circuit Judge:

Virginia's and Maryland's petitions to review an order of the Civil Aeronautics Board (Board), a proceeding in which two carriers—Pan American World Airways, Inc., and Trans World Airways, Inc.—and numerous affected localities —Philadelphia, Washington, Chicago, Detroit, Boston, Metropolitan New York-New Jersey—have been permitted to intervene, raises the basic question of whether the Board exceeded its statutory powers or acted arbitrarily or unreasonably in prescribing the formula for fixing new transatlantic cargo rates after it concluded that the then existing rate unduly preferred New York and prejudiced Boston, Philadelphia, Baltimore, Washington, Cleveland, Detroit and Chicago. Specifically, the Board found that cargo rates to United States gateway cities other than New York, constructed by adding the domestic rate from gateway city to New York to the New York-European rate, irrespective of whether the shipment was in fact flown through New York, was unduly preferential to New York and unduly prejudicial to the other gateway cities.[1] None of the parties contests the correctness or lawfulness of this conclusion.

Having concluded that the then existing rates were unlawful, the Board directed the establishment of rates computed by multiplying the mileage, by the shortest point-to-point route from European points to the various United States gateway points, by the New York-European rate per mile. It rejected the recommendation of the Administrative Law Judge that the best way to remedy the prejudicial rate structure was to prescribe a common rate, i. e., the same rate, for the gateways of Boston, New York, Philadelphia, Baltimore and Washington.[2] In these petitions for re-

---

1. European air cargo rates consist of general commodity rates, specific commodity rates, and container or "bulk utilization" rates. The majority of cargo moves under specific commodity rates and an increasing amount under container rates.

   The proceeding was begun in 1968 at the instance of the City of Baltimore. At that time, all rates to gateway cities other than New York were computed as stated in the text. In 1969, however, general commodity rates to all cities and specific commodity rates to Philadelphia and Baltimore-Washington were altered to require the addition of flat add-ons (known as "arbitraries") in lieu of the domestic rate to the New York-European rate. These arbitraries were somewhat lower than the domestic rate from New York to the other gateway city, but they still produced an overall rate significantly higher than an amount related to the mileage · differential between a European point and New York as compared to the mileage between a European point and another United States gateway point. For example, although the Baltimore-Paris mileage is only 4.9% greater than the New York-Paris mileage, the specific commodity rate for data processing systems from Baltimore-Paris ranged from 7.5–12% above the New York-Paris rate.

2. The Board did prescribe a common rate for Baltimore and Washington in recognition of the fact that the Baltimore-Washington International Airport, located between the two cities, and Dulles Airport, located in Northern Virginia, serve both communities. This

view, Baltimore and Washington, joined by Philadelphia,[3] contend that the Board erred in failing to prescribe a common rate for the Northeast Corridor cities with New York.

From our review of the record, we conclude that the Board did not exceed its statutory authority or act arbitrarily or unreasonably in prescribing the mileage rate. We affirm the Board's order.

### I.

█ While the Board has authority to prescribe rates, fares and practices in domestic air transportation, 49 U.S.C. § 1482(d), its authority over rates and fares for international air transportation is more limited. This is so because of Congressional recognition that the rate-making authority of one nation in international air transportation necessarily can be exercised only with the acquiescence of another nation to which traffic is destined or from which it originates.[4] Thus, except for the recently granted limited power to suspend or reject unjust or unreasonable rates and fares in international transportation but not to prescribe just and reasonable new rates or fares,[5] the rate-making authority of the Board in a case like the instant one is limited to a determination of whether a rate, fare or charge "is or will be unjustly discriminatory, or unduly preferential, or unduly prejudical," and if so, "[to] alter the same to the extent necessary to correct such discrimination, preference, or prejudice . . . ." 49 U.S.C. § 1482(f).

Both Virginia and Maryland advance two overall contentions why the Board's

order should be set aside: first, that as a matter of law the Board was required to prescribe a common rate for all United States gateway cities, and, second, that the milage rate prescribed by the Board continues the previously existing undue preference to New York and undue discrimination against the other cities, especially Washington and Baltimore. These overall contentions involve a number of subsidiary arguments which we will treat *seriatim*. Additional facts will be stated where they are pertinent.

### II.

The argument that, as a matter of law, the Board was required to prescribe a common rate is in part factual and in part legal. Both the Administrative Law Judge and the Board found that New York handles eighty percent of the nation's international air cargo; that, as a result of this volume, New York experiences the highest rate of pilferage from shipments of any other terminal in the United States; that congestion and delays result from the proliferation of traffic through New York; that non-transport expenses are greater at New York; and that shippers in places other than New York are encouraged by New York's then existing preferential rate to employ surface transportation (trucks) to and from New York rather than through air transportation to points of origin and destination in the gateway city nearest to the shipper. It is argued that since there is a strong national interest in avoiding a monopoly of imports and exports in a single port, the way to achieve equality of opportunity—indeed,

common rate is the average of the two rates for each class of cargo to each of the two cities.

3. Philadelphia did not petition to review the Board's order; rather, it intervened in this proceeding and supports the position of Virginia and Maryland. As a consequence, the Board questions our jurisdiction to grant relief to Philadelphia even if relief should otherwise be indicated. In the view that we take of the proper disposition of the petition for review, we find it unnecessary to decide the jurisdictional question. In our discus-

sion, we will speak only of Virginia and Maryland.

4. As a concomitant to the need for international cooperation in rate-making, international air fares and rates are generally established through the traffic conference machinery of the International Air Transport Association (IATA). For a description of the process, see National Air Carrier Ass'n v. C. A. B., 141 U.S.App.D.C. 31, 436 F.2d 185, 186 (1970).

5. P.L. 92–259, March 22, 1972; 49 U.S.C. §§ 1374(a), 1461 and 1482(j).

the *only* way as prescribed by Congress —is to prescribe a common rate, notwithstanding that New York is 190 miles closer to European cities than Baltimore-Washington. Heavy reliance is placed upon the provisions of the Interstate Commerce Act, 24 Stat. 379, and I.C.C. and court decisions interpreting it to permit or require common-rating in certain instances, because it is asserted that such Act served as a model for the anti-discrimination provisions of the Federal Aviation Act of 1958, and therefore the latter should receive a like interpretation.

■ We think that there are several reasons to reject this argument. First, there can be little doubt that, in fashioning a remedy where undue preference and undue discrimination have been found to exist, an administrative agency possesses a large measure of discretion in choosing measures to remedy the discrimination. Its exercise of this discretion will not be disturbed absent a showing that its order lacks evidentiary support, transgresses some constitutional limit, or otherwise amounts to an abuse of power. Board of Trade v. United States, 314 U.S. 534, 546, 62 S. Ct. 366, 86 L.Ed. 432 (1942); Ayshire Collieries Corp. v. United States, 335 U. S. 573, 593, 69 S.Ct. 278, 93 L.Ed. 243 (1948).

■■ Factually, the premise of the Board's order that "the most equitable and practical rate structure is one based on mileage" has substantial evidentiary support. The record shows that major costs for air transportation tend to vary with miles flown. It is, of course, true that the anti-discrimination provisions of the Federal Aviation Act are closely modeled on their counterparts in the Interstate Commerce Act, but that is not to say that the decisional precedents of one statute can be indiscriminately imputed to another. Substantial differences in the operations of rail and air transportation may well warrant a different regulatory approach to each industry. Chicago & Southern Air Lines, Inc. v. Waterman S.S Corp., 333 U.S. 103, 108, 68 S.Ct. 431, 92 L.Ed. 568 (1948); Las Vegas Hacienda, Inc. v. C. A.B., 298 F.2d 430 (9 Cir. 1962). Unit costs of railroad operations do not tend to increase with distance nearly as much as in air carrier operations. Thus, decisions approving or imposing common-rating on rail carriers would not depart from the cost of service approach of rate-making to the same extent as would common-rating for air transportation. It follows, we think, that the C.A.B. is not bound by the common-rating decisions applicable to railroads, and the C. A.B. has broader discretion than the I. C.C. to require that differences in distances be reflected in differences in rates.

■ More importantly, the anti-discrimination provisions of neither Act were intended to deprive a locality of the natural advantages of its geographic location. United States v. Illinois Central Ry., 263 U.S. 515, 524, 44 S.Ct. 189, 68 L.Ed. 417 (1924); Alabama G.S.R. Co. v. United States, 340 U.S. 216, 71 S. Ct. 264, 95 L.Ed. 225 (1951).[6] New York is closer to European cities than Baltimore and Washington, by an average distance of 190 miles, and this fact alone should support a higher overall rate differential for the latter.

■ The instances in which the Board has approved common rates do not persuade us that the Board acted arbitrarily or capriciously in rejecting them here. Nearly all domestic rates and fares reflect distance and among domestic points common-rating is rare. The majority of rates for international transportation is not common-rated.

---

6. Even under the Interstate Commerce Act, the I.C.C. has given full recognition to distance as a significant factor supporting rate disparities. For some examples, see Board of Trade v. Ill. Cent. R. Co., 344 I.C.C. 818 (1973); Canaveral Port Authority v. Ahnapee & W. Ry. Co., 337 I.C.C. 681 (1970); Maritime Association, Boston Chamber of Commerce v. A. A. R. R. Co., 95 I.C.C. 539 (1925).

The Board has, nevertheless, given approval to some international common-rating,[7] but it has apparently done so because of "special circumstances" not present here, or because of the need for cooperation and agreement among nations engaged in air transportation. See IATA Transatlantic Cargo Rates, Opinion on Remand, Order 73–10–55, October 15, 1973. At the same time, the Board has consistently emphasized that international air fares should be priced according to costs and related to distances. Statement of C.A.B. on North Atlantic and Mid-Atlantic Fare Matters to be Negotiated at the IATA Traffic Conference in Montreux, July, 1972; IATA Transatlantic Fares Agreement, Order 72–3–104, March 30, 1972; IATA Transatlantic Fares Agreement, Order 73–4–64, April 13, 1973; Hawaiian Common Fares Case, 10 C.A.B. 921 (1949).

Finally, the reasonableness of the Board's exercise of its discretion to require mileage rates can also be demonstrated by the discriminatory effect that the common-rating advocated by Baltimore and Washington would have and the economic impact of common-rating on affected carriers. It should be remembered that the Board's rate-making powers in the instant case are exercisable only in the limited context of removing undue preferences and undue discrimination. The Board would hardly carry out its statutory duty if it created new and different undue preferences or undue discrimination. And yet common-rating Baltimore, Washington, Philadelphia, and Boston with New York would create preferences and discrimination that could properly be deemed "undue." Under such a scheme, Boston, which is nearer to most European cities than New York, and New York, which is nearer than Philadelphia, Baltimore or Washington, would both lose the economic advantage of their geographic locations. They would be discriminated

against. Conversely, Philadelphia, Baltimore and Washington would be preferred. Cleveland, Chicago and Detroit would also be adversely affected. For example, air mileage from Cleveland to London is only 3.2% greater than that from Baltimore to London. Yet, if Baltimore were common-rated with New York, Cleveland's rates would be 12.3% greater than Baltimore's rates.

■ The level of rates, *per se*, was not an issue in the proceedings before the Board. Nonetheless, we think that the Board properly considered the economic impact of common-rating on the carriers affected. In this regard, the Board found that common-rating would result in a two-fold reduction in revenues, viz. revenues on freight originating at or destined for gateways other than New York, and revenues to the transatlantic carrier for goods originating at or destined for gateways other than New York which are routed over domestic carriers via New York for which pro-rating of revenues with the domestic carrier is required. Inferentially, common-rating could bring about higher rates—a result which the Board ought not to encourage if it has a choice in the matter.

For all of these reasons, we conclude that the Board was not required as a matter of law to prescribe common rates, and its exercise of its discretion not to prescribe common rates should not be disturbed.

### III.

We turn to the contention that the mileage rate prescribed by the Board continues the previously existing undue preference to New York and undue discrimination against the other cities, especially Baltimore and Washington.

■ In support of this conclusion, Maryland argues that the Board's mileage formula is intrinsically invalid and discriminatory because only about 55% of the North Atlantic air freight rate is

7. Hawaiian Common Fares Case, 37 C.A.B. 269 (1962); Northwest-Alaska Tariff Investigation, 17 C.A.B. 903 (1953); West Coast Common Fares Case, 15 C.A.B. 90 (1952).

accounted for by costs which vary by mileage. It is argued, therefore, that it is preferential to New York and prejudicial to Baltimore to require Baltimore shippers and importers to pay a differential based on application of the mileage difference to 100% of the rate. We are not persuaded. First, there is evidence in the record that the relationship between costs and mileage may be higher than 55%. The reason for this is that there is a point in projecting a long-range direct flight that the carrier must sacrifice payload weight for fuel to complete the voyage. Additionally, as found by the Board, some indirect costs also increase with mileage. For example, servicing costs are generally treated as indirect costs, and servicing is more frequent when equipment is flown greater distances. More importantly, the object of the instant proceedings was to determine the *relationship* among rates to the various cities involved and *not* the precise level of those rates. We do not believe that the Board, having provided a formula which permits Baltimore to compete with New York commensurate with its geographic location without "undue" discrimination, was required to compute and impose a rate differential in terms of precise costs.

■ Virginia asserts that the Board's mileage-based formula is intrinsically invalid and discriminatory because the per-mile rate between a given United States gateway city and a given European city is not always the same as the rate between that United States gateway city and another European city. To illustrate, Virginia points out that New York shippers get 4,004 miles of air transportation to Milan, Italy, for 78 cents per pound; but for 3,646 miles of air transportation to London—almost 400 miles less—Dulles airport shippers must pay 79 cents per pound. This example, Virginia contends, demonstrates that the New York shipper is unduly preferred and the Dulles shipper is unduly discriminated against.

The short answer to the argument, however, is that Virginia seeks to compare apples with oranges. There is common-rating of points in Europe, usually at the instance of European governments, and this is a matter beyond the regulation or control of the Board. But the fact is that to any *particular* European city the mileage rate from New York or any other United States gateway city is precisely the same, and, hence, there is neither preference to New York nor discrimination against the other United States gateway cities. For example, if, as a result of common-rating in Europe, the mileage rate from New York to a given city in Europe is two cents more or less than the rate from New York to London, it is the same two cents more or less than the rate from any other United States city to London.

■ Virginia also argues that New York is preferred because specific through rates are published from New York, while the rates to the other gateways are computed pursuant to a conversion table reflecting the mileage differential over New York applicable to each of the other gateways. We do not deem this a preference. The computation to find the rate to another gateway city is merely the multiplication of the percentage mileage differential over New York by the New York rate. We do not think that the task is so difficult that it would affect a shipper's selection of gateways.

■ Finally, Maryland argues that the common-rating for Baltimore and Washington should be the mileage to Baltimore, and not the average of the mileages to Baltimore and Washington, in order to prevent creation of a new discrimination against Baltimore area shippers. We do not agree. The Board found that because of the close geographical proximity of the two cities and the virtual overlap of the service areas of their respective international airports, a common rate was virtually essential and use of the mid-point mileages as a basis for the common rate represented a fair balancing of the inter-

ests of shippers in both cities. In this, we think the Board eminently correct; certainly it did not abuse its discretion.

For all of these reasons, the order of the Board is

Affirmed.