LOUISVILLE AND NASHVILLE RAIL-
ROAD COMPANY et al.,
Plaintiffs,

v.

The UNITED STATES of America
et al., Defendants.

No. C–74–203–L(B).

United States District Court,
W. D. Kentucky,
Louisville Division.

July 29, 1975.

Joseph E. Stopher, Fred R. Birkholz, Louisville, Ky., for plaintiffs; James L. Tapley, Southern Railway Co., Washington, D. C., John H. Doeringer, Illinois Central Gulf R.R., Chicago, Ill., of counsel.

George Long, U.S. Atty., Ben T. Cooper, Louisville, Ky., for defendants.

Robert H. Streeter, I.C.C., Washington, D. C., Harold E. Spencer, Chicago, Ill., for I.C.C.

Before PHILLIPS, Circuit Judge, and BRATCHER and ALLEN, District Judges.

## MEMORANDUM OPINION AND ORDER

BRATCHER, District Judge.

This is an action by several railroad companies seeking judicial review of a report and order of the Interstate Commerce Commission which found that plaintiffs had not shown a proposed modification of arrangements for the transit of vegetable oil, cake or meal was just and reasonable. Plaintiffs ask this Court to set aside the report and declare that the modification of the transit agreement is just, reasonable, and therefore valid. This Court's jurisdiction is invoked pursuant to § 17(9) of the Interstate Commerce Act (hereinafter the "Act"), 49 U.S.C. § 17(9) under 28 U.S.C. §§ 1336, 1398, 2284, 2321–2325, and under §§ 701–706 of the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

The plaintiffs are the Louisville and Nashville, Seaboard Coast Line, Southern Railway, and Illinois Central Gulf Railroad Companies and comprise the major railroads operating in the Southern Freight Association Territory. The defendant, United States of America, is joined by several intervenor defendants, the Interstate Commerce Commission (hereinafter the Commission) and Ralston Purina Company, Inc.; Allied Mills, Inc.; Security Mills, Inc.; and Jim Dandy Company (hereinafter collectively referred to as shipper defendants).

The facts and history of the case in the agency proceedings are as follows: Plaintiffs attempted to modify the transit arrangement which has been in effect since 1959 for the shipping of vegetable oil, cake or meal (hereinafter referred to as meal). Though not technically the case, the effect of such a modification would be to increase the rates for meal transportation.

The long standing shipping arrangement provided for what the industry refers to as a "transit privilege". This term refers to the practice of setting a single rate for shipping commodities from one point to another with a stop at an intermediate point for the purpose of processing or storage. Under this transit agreement, the shipper would be charged a fixed rate from the origin to the final destination point as if it were a continuous movement, without regard to the intermediate stop. This procedure is actually a fiction in that it treats two distinct shipments as though they are one. *Board of Trade v. United States*, 314 U.S. 534, 62 S.Ct. 366, 86 L. Ed. 432 (1942).

This practice is advantageous to the shippers in that the rate for a through shipment is less than the rates for the two separate shipments—origin to transit point, transit point to final destination. Further, under the transit privilege arrangement, the rates are based on the weight of the inbound shipment from the point of origin to the transit point rather than the weight of the meal in the outbound shipment, as is the case with the present modification. This is significant in that the inbound shipment of meal weighs more than the usual amount of meal in the outbound shipment of processed animal and poultry feed; and, under the present agreement, the heavier the shipment, the lower the rates.

Thus, the present modification in the transit arrangement has the effect of increasing the rate charged for the transportation of meal.

Upon the protest from the shippers, the Commission, pursuant to § 15(7) of the Act, suspended the proposed modification (hereinafter the new tariff schedules) by order dated March 29, 1973. The Commission ordered an investigation and held hearings which culminated in an order that cancelled the proposed tariff schedules. The order was based upon the Commission's report which found the railroads had failed to meet their burden under § 15(7) of showing that the change was just and reasonable.

Since the order of cancellation was not a final order, the suspended tariff schedules went into effect on October 31,

1973, at the end of the seven-month suspension period provided for under § 15(7) of the Act.

In May, 1974, the Commission issued its final order cancelling the new tariff schedules effective June 10, 1974. However, on June 6, 1974, the Court sustained the railroads' motion for a temporary restraining order, staying the effectiveness of the cancellation and allowing the new tariff schedules to remain in effect. The Court directed the railroads to continue to escrow the funds derived from the increased tariffs, therefore adequately protecting the shippers from damage which might result in the event the Commission's order was upheld.

The argument that the railroads set forth at the Commission hearing was that the present transit agreement was a special one for the shippers of meal and was not the normal agreement for the majority of the shipping industry. The railroads contended that the change is economically warranted or justified by the need to return to the normal transit agreements in use throughout the industry.

The Commission heard testimony that the transit privilege arrangement was set up in order to obtain business for the railroads that had been going to the trucking industry. It then concluded that the change of the agreement would divert a considerable portion of the feed traffic away from the railroads and that the meal traffic would be diverted to a "considerable extent". The Commission reasoned this would be self-defeating in that it would actually result in a loss of revenue for the railroads.

Plaintiffs present three major arguments against the Commission's report. First, plaintiffs contend the finding that the railroads would suffer a loss of traffic and thus revenue from the proposed tariff change is erroneous and not supported by substantial evidence. Second, the plaintiffs argue that the Commission wrongfully relied on § 15a(2) of the Act in concluding that the proposed tariff change was not shown to be just and reasonable. Thirdly, the plaintiffs argue that the new schedules are presently and lawfully in effect and that if the Court sets aside the Commission's order, then nothing further is required to validate the new schedules.

■ A reading of the Commission's decision reveals to the Court that a major, if not total, reliance for its order was placed upon § 15a(2) of the Act which states:

"(2) In the exercise of its power to prescribe just and reasonable rates the Commission shall give due consideration, among other factors, to the effect of rates on the movement of traffic by the carrier or carriers for which the rates are prescribed; to the need, in the public interest, of adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service; and to the need of revenues sufficient to enable the carriers, under honest, economical, and efficient management to provide such service."

The Court does not feel that plaintiffs' attack upon this procedure has merit. The cases cited by the United States, such as *Central of Georgia Railroad Co. v. United States*, 379 F.Supp. 976 (D.D.C.1974), affirmed 421 U.S. 957, 95 S.Ct. 1944, 44 L.Ed.2d 446 (1975), and *Atlantic Coast Line Railroad Co. v. United States*, 209 F.Supp. 157 (S.D.Fla., 1962), support the argument that § 15a(2) standards may be used in a 15(7) proceeding. These cases discuss the fact that Congress' intent was to allow the Commission to apply the factors of effect on the movement of traffic and loss of revenue to the carrier in determining the justness and reasonableness of rates. Thus, it is the opinion of the Court that the Commission acted properly in applying the procedure of § 15a(2) in examining the justness and reasonableness of the rates.

■ The Court must look at the basic essential findings that the Commission is required to make in support of its or-

der. The findings must be supported by substantial evidence as shown in the record. Without this substantial evidence, the Court cannot uphold the decision. *Cincinnati, New Orleans & Texas Pac. Ry. v. United States*, 229 F.Supp. 572 (D.C.Ohio, 1964), vacated on other grounds 379 U.S. 642, 85′ S.Ct. 610, 13 L.Ed.2d 550 (1965); *Florida v. United States*, 282 U.S. 194, 51 S.Ct. 119, 75 L. Ed. 291 (1931).

█ The evidence which the Commission relied upon for its decision consisted of testimony from representatives of the four shipper defendants. Their statements are predictions, conjectures and opinions of what might happen if the transit privilege is cancelled. Further, to the extent that they were made in support of the effort to have the questioned tariff modification cancelled, they are self-serving. This is the only testimony in the record as to the shifting of the traffic pattern. Thus, the record is devoid of any substantial evidence to support a finding that there would be a "considerable" shift in the movement of the traffic pattern from rail to truck or water carriage. Although the prediction from the shippers is fairly detailed, it is nontheless an attempt to forecast what might occur if the new rates are upheld. See *United States v. Chicago M. St. P. & P. R.R.*, 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023 (1935).

The Court notes that nowhere in the record is there a look into the trucking industry to see what changes, if any, are occurring which would affect those rates. It appears to the Court that much more is involved in determining whether there will be a drastic change in the movement of traffic from rail to truck than looking at an increase in rates of only one type carrier.

Further, the Court finds no substantial evidence to support the Commission's finding that the rail carriers would experience a loss of revenue by increasing their rates. The only basis for their conclusion in this regard is the unsupported forecasts of the shippers. To the contrary, the plaintiffs' evidence shows that the railroads have incurred a loss of revenue from the transportation of meal, and this uncontroverted evidence supports their position. It is clearly established that if there should be a diversion of meal traffic as predicted by the shippers, the carriers would actually be in a better financial position than at present. (Tr. 35, 36; Exhibit 1, p. 13).

█ The scope of our review of Interstate Commerce Commission orders is limited to a consideration of the record and is not de novo. The reviewing court must give weight to the expertise of the Commission and cannot overrule its decision unless it is found to be arbitrary, capricious, not in accordance with the law, or not supported by substantial evidence. If the decision is found to be supported by substantial evidence of record, then it must be affirmed. 5 U.S.C. § 706. *Public Service Commission of W. Virginia v. United States*, 365 F.Supp. 6 (S.D.W.Vir., 1973).

With the standards hereinabove enumerated in mind and after a review of the record in its entirety, the Court finds that there is not substantial evidence to support the Commission's finding that plaintiffs have failed to meet their burden of showing that the new tariff schedule is just and reasonable. To the contrary, the record reveals by substantial evidence that the burden has been met and that the tariff modification seems just and reasonable under the circumstances.

Therefore, it is the decision of the Court that the order of the Commission concerning these proposed rate modifications issued in May, 1974, is hereby set aside. Further, it is our considered judgment that a remand of this case to the Interstate Commerce Commission would not serve any useful purpose.